597 S.E.2d 145

**KIAWAH PROPERTY OWNERS GROUP, Appellant,**

v.

**The PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA; and Kiawah Island Utility Company, Inc., Respondents.**

No. 25827.

Supreme Court of South Carolina.

Heard Jan. 21, 2004.

Decided May 24, 2004.

106

Stephen L. Brown, Michael A. Molony and Lea Kerrison, all of Young, Clement, Rivers, and Tisdale, of Charleston, for Appellant.

Fred David Butler, of Columbia, for Respondent South Carolina Public Service Commission.

G. Trenholm Walker and Amanda R. Maybank, both of Pratt Thomas, Epting and Walker, of Charleston, for Respondent Kiawah Island Utility Company.

Acting Chief Justice MOORE:

This matter arises from a utilities rate dispute between the Kiawah Island Utility Corporation (Utility) and the Kiawah Property Owners Group (KPOG). On appellate review, the circuit court judge found that the Public Service Commission's (PSC) approval of an increase of the Utility's rates and charges that would allow for an operating margin of 6.5% was supported by substantial evidence. We affirm.

## FACTS

In 1996, the Utility, which is wholly owned by Kiawah Resort Associates (Developer), applied to the PSC for a rate increase that would increase its operating margin to 5.43%. The PSC approved a rate increase that allowed for only a 3.55% operating margin. On appeal, the circuit court judge upheld the rate increase, and this Court reversed and remanded, finding that the PSC order permitting the rate increase was unsupported by the evidence. *Kiawah Prop. Owners Group v. Pub. Serv. Comm'n,* 338 S.C. 92, 525 S.E.2d 863 (1999) (*KPOG I* ). Upon remand, a subsequent PSC order, and an appeal to the circuit court, the matter was again appealed to this Court, resulting in the opinion finding that the subsequent PSC order was supported by the evidence. *Kiawah Prop. Owners Group v. Pub. Serv. Comm'n,* 357 S.C. 232, 593 S.E.2d 148 (2004), (*KPOG II* ).

Upon this backdrop, another rate dispute began in 1999, when the Utility set out to raise its rates and charges to permit an operating margin of 9.5%. The PSC submitted an order, which was affirmed on appeal by the circuit court, authorizing a rate increase that would generate a 6.5% operating margin. KPOG has appealed the circuit court decision, raising the following issues for review:

I. Did the trial court err in finding that the PSC's decision to allow the Utility to set its operating margin at 6.5% was supported by the record?

II. Did the circuit court err in affirming the PSC's treatment of several of the Utility's fee assessments and other affiliated transactions?

III. Did the circuit court judge err in affirming the PSC's refusal to require the Developer and Utility to modify

their cross-collateralized loan agreement with the bank?

IV.  Did the circuit court err in refusing to require the PSC to stay this proceeding until this Court issued its opinion in *KPOG II?*

## STANDARD OF REVIEW

■  The PSC is a government agency of limited power and jurisdiction, which is conferred either expressly or impliedly by the General Assembly. *City of Camden v. South Carolina Pub. Serv. Comm'n,* 283 S.C. 380, 382, 323 S.E.2d 519, 521 (1984). South Carolina Code Ann. § 58-5-210 (Supp.2003) grants the PSC the "power and jurisdiction to supervise and regulate the rates and services of every public utility in this State...."

■  The PSC should establish rates that will produce revenues for the utility "reasonably sufficient to assure the confidence in the financial soundness of the utility ... and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." *Bluefield Water Works and Improvement Co. v. Pub. Serv. Comm'n of West Virginia,* 262 U.S. 679, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176 (1923).

■  The PSC is considered "the 'expert' designated by the legislature to make policy determinations regarding utility rates; thus, the role of a court reviewing such decisions is very limited." *Hamm v. South Carolina Public Service Comm'n,* 289 S.C. 22, 344 S.E.2d 600 (1986); *Patton v. South Carolina Pub. Serv. Comm'n,* 280 S.C. 288, 312 S.E.2d 257 (1984). Therefore, the party challenging a PSC order must establish that (1) the PSC decision is not supported by substantial evidence and (2) the decision is clearly erroneous in light of the substantial evidence in the record. *Patton,* 280 S.C. at 291, 312 S.E.2d at 259; *Greyhound Lines, Inc. v. South Carolina Pub. Serv. Comm'n,* 274 S.C. 161, 262 S.E.2d 18 (1980).

## ISSUE I

Did the trial court err in finding that the PSC's decision to allow the Utility to set its operating margin at 6.5% was supported by the record?

■ The Utility applied for a rate increase in 1999, requesting that the PSC allow it to charge rates sufficient to sustain a 9.5% operating margin. The PSC determined that a 6.5% operating margin was appropriate. KPOG asserts that the PSC's decision to set the Utility's operating margin at 6.5% is unsupported in the record. We disagree.

At the PSC hearing, the Utility's treasurer, Townsend Clarkson (Clarkson), testified that the application for a rate increase was prompted by (1) a 20.2% increase in the cost of water since the Utility's prior rate application; (2) the capital cost incurred to improve and maintain 45 miles of transmission lines; and (3) the fact that the Utility had operated at a net loss since 1995. In addition, PSC staff member Thomas Ellison (Ellison) testified that the Utility had an operating margin of negative 1.02% and recommended that PSC permit the Utility to raise rates to sustain an operating margin of 8.03%.

Based on this testimony, the PSC concluded that the Utility could raise its rates and charges to generate a 6.5% operating margin, up from the 3.55% margin that the PSC had approved in the Utility's prior rate application.

We hold that the PSC's decision to set the Utility's operating margin at 6.5%—a number much less than what the PSC staff recommended—was supported in the record by the testimony of Clarkson and Ellison.[1]

---

1. KPOG asserts that since the PSC determined that the expert testimony of the Utility's accountant, who testified that 9.5% was a reasonable operating margin, was not credible; the PSC erred in arriving at the 6.5% figure. But as the circuit court judge duly noted, the PSC does not have to arrive at the appropriate operating margin based on any expert testimony. Rather, it arrives at the operating margin figure based on its own staff's research, and "the rejection of [the accountant's] testimony did not leave [PSC] without an evidentiary basis for its findings."

## ISSUE II

Did the circuit court err in affirming the PSC's treatment of several of the Utility's fee assessments and other affiliated transactions?

### BUILDING INCENTIVE FEES

KPOG asserts that the trial court erred in affirming the PSC's determination that the Developer's building incentive fee, charged to owners of undeveloped property, should not be recognized by the Utility for ratemaking purposes. We disagree.

An evaluation of the building incentive fee requires (1) an analysis of the nature of the building incentive fee as compared to the "availability fee" and (2) an application of a recent opinion by this Court: *Total Envtl. Solutions, Inc. v. South Carolina Pub. Serv. Comm'n*, 351 S.C. 175, 568 S.E.2d 365 (2002).

KPOG argues that the building incentive fee—a $40 fee the Developer (who owns 100% of the Utility) assesses quarterly to all property owners of undeveloped property—does not differ from the "availability fee"—a $40 fee that the Developer *formerly* charged per quarter to property owners of undeveloped property once the water and sewer lines approached within 100 feet of their lot line until the property owner connected to the water and sewer system.

Historically, the PSC ruled that the "availability fees" would be recognized as a contribution by the parent-Developer to the subsidiary-Utility in aid of construction, which would be recorded on the Utility's balance sheet as an appreciation or improvement to an asset—a recognition that only affects the Utility's rate base.

In prior orders, the PSC found that (1) the "building incentive fee" charged by the Developer was instituted "for the same purpose as the former availability fee ...," and (2) the former "availability fee" was "now known as the 'building incentive' fee." The PSC also determined in the prior orders that the proceeds from the building incentive fees should be recognized as a contribution by the Developer to the Utility in

aid of construction, the same treatment given to the "availability fees."

In the present case, the PSC determined that, based on the evidence presented at the PSC hearing, the $40 quarterly building incentive fee would *not* be treated as a contribution by the Developer in aid of construction. At the hearing, Clarkson testified that the building incentive fee was "not collected to assure water and sewer availability but instead to encourage building houses on vacant lots." [2] The PSC refused to recognize the building incentive fees as contributions in aid of construction because KPOG failed to establish that building incentive fees were the same as the old "availability fees" and that "there was no proper methodology for characterizing building incentive fees." While we are skeptical of the PSC's historic inconsistent treatment of these fees, we agree that Clarkson's testimony supports the conclusion that the building incentive fees were not assessed to help subsidize the Utility's sewer and water infrastructure.[3]

In *Total Envtl. Solutions*, this Court concluded that the PSC lacks jurisdiction to regulate availability fees when there is no evidence that the utility received or directly benefited from the assessment. 351 S.C. at 180, 568 S.E.2d at 369. Since KPOG provided no evidence that the Utility directly benefited from the building incentive fee, we find that the circuit court correctly affirmed the PSC's decision to not recognize the fee as a contribution in aid of construction.

## OTHER AFFILIATED TRANSACTIONS

KPOG asserts that the Developer should reimburse the Utility (1) $64,000 of the $100,000 management fee that the PSC did not recognize for ratemaking purposes, and (2)

---

**2.** The building incentive fee assessment did not hinge on whether the water and sewer infrastructure was within 100 feet of the undeveloped property owner's property line. Rather, the fee was assessed to *all* undeveloped property owners.

**3.** There are inconsistencies in how the PSC has treated these fees. It admits that the fees are one in the same, and it seems that the only difference in the two fees is, in fact, the name, for they both are collected to encourage development. But since KPOG did not meet the evidentiary standard, we hold that the circuit court did not err in upholding the PSC's decision.

$139,807 that the Utility paid the Developer for fire hydrants in 1991. We find that the PSC lacks the authority to order the Developer to reimburse the Utility for the management fee or the cost of the fire hydrants. *KPOG II.*[4]

KPOG also asserts that the PSC erred in (1) recognizing the Utility's transfer and distribution lines and the expenses involved with their upkeep for ratemaking purposes and (2) refusing to include tap-in fees charged by the Developer to the Utility from 1992 to 1996 as revenues to the Utility. Since KPOG first broached the transfer line issue in its petition for rehearing to the PSC, the issue is not preserved. *See Patterson v. Reid,* 318 S.C. 183, 456 S.E.2d 436 (Ct.App. 1995) (a party may not raise an issue in a motion to reconsider, alter or amend a judgment that could have been presented prior to the judgment); *see also McGee v. Bruce Hosp. Sys.,* 321 S.C. 340, 468 S.E.2d 633 (1996) (a party may not raise an issue for the first time in a motion for a new trial).

Further, KPOG has not preserved the tap-in fee issue because, while it initially raised the issue before the PSC, it did not petition the circuit court to review the PSC's decision to not recognize the tap-in fees as revenue. *See Pringle v. Builders Transp.,* 298 S.C. 494, 381 S.E.2d 731 (1989) ("A petition for circuit court review pursuant to the Administrative Procedures Act (APA) must direct the court's attention to the abuse allegedly committed below, including a distinct and specific statement of the rulings of which appellant complains.").

### ISSUE III

Did the circuit court judge err in affirming the PSC's refusal to require the Developer and Utility to modify their cross-collateralized loan agreement with the bank?

---

4. *KPOG II* provides that under S.C.Code Ann. § 58–5–20 (1976), the PSC only retains the authority to regulate a utility "with respect to its activities in the provision of utility services" and does not grant the PSC the authority "to order a *separate entity* to ... make payments to the Utility for certain assets, [or] to donate fire hydrants to the [U]tility, etc." *KPOG II,* at 239, 593 S.E.2d at 152 (emphasis added).

Accordingly, based on this reasoning from *KPOG II,* the circuit court did not err in finding that PSC does not have any authority over the Developer, even though the Developer owns 100% of the Utility's stock.

KPOG argues that the Utility's 1995 modification of its loan contract with Bank of America to cross-collateralize and cross-default the Developer's outstanding loan with the bank was unfair. We disagree.

As we noted in *KPOG II*, the argument that the cross-collateralized loan agreement will harm ratepayers in the future does not present a justiciable controversy. *KPOG II*, at 243, 593 S.E.2d at 154 (citing *Pee Dee Elec. Coop., Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983)). Thus, this Court will not review this issue at present.

## ISSUE IV

Did the circuit court err in refusing to require the PSC to stay this proceeding until this Court issued its opinion in *KPOG II?*

KPOG asserts that the PSC should have stayed the Utility's rate application review until this Court issued its opinion in *KPOG II*. While these two appeals cover similar issues, they arise from separate controversies: two different rate applications.

Further, the Utility is statutorily authorized to file a rate application every twelve months, and the PSC must act upon the application within six months. S.C.Code Ann. § 58–5–240(C) and (F) (Supp.2002). The PSC only has authority to stay issuance of its order for five days beyond the six-month period. S.C.Code Ann. § 58–5–240(D). Therefore, PSC did not abuse its discretion in failing to grant KPOG's request for stay pending our decision in *KPOG II*.

## CONCLUSION

Based on the forgoing reasoning, we find that the PSC's decision to raise the Utility's rates to sustain a 6.5% operating margin is supported by the record. We further find that the PSC's treatment of the building incentive fees was also supported by the evidence. All of KPOG's other claims are

without merit. Accordingly, we **AFFIRM** the circuit court's affirmance of the PSC order.

WALLER, BURNETT, PLEICONES, JJ., and Acting Justice G. THOMAS COOPER, JR., concur.