803 S.E.2d 280

**DAUFUSKIE ISLAND UTILITY COMPANY, INC., Appellant,**

v.

**SOUTH CAROLINA OFFICE OF REGULATORY STAFF, Haig Point Club and Community Association, Inc., Melrose Property Owner's Association, Inc., and Bloody Point Property Owner's Association, Respondents.**

Appellate Case No. 2016-000652
Opinion No. 27729

Supreme Court of South Carolina.

Heard December 14, 2016
Filed July 26, 2017

306

308

George Trenholm Walker and Thomas P. Gressette, Jr., both of Walker Gressette Freeman & Linton, LLC, of Charleston, for Appellant.

Lyndey Ritz Zwingelberg and John Julius Pringle, Jr., both of Adams and Reese LLP, Shannon Bowyer Hudson and Andrew McClendon Bateman, both of South Carolina Office of Regulatory Staff, all of Columbia, for Respondents.

JUSTICE HEARN:

Petitioner Daufuskie Island Utility Company ("DIUC") appeals an order of the South Carolina Public Service Commission ("Commission") granting only thirty-nine percent of the additional revenue requested in its application. We reverse and remand to the Commission for a new hearing.

## FACTUAL/PROCEDURAL BACKGROUND

DIUC is the only provider of water and wastewater services to residential and commercial customers on Daufuskie Island in Beaufort County, South Carolina. In June 2015, DIUC applied to the Commission for approval of a new rate schedule which would provide a 108.9% revenue increase based upon a 2014 test year. Pursuant to Section 58-4-10(B) of the South Carolina Code (2015), the South Carolina Office of Regulatory Staff ("ORS") was automatically joined as a party to the matter. Additionally, a number of property owners' associations on Daufuskie Island—Haig Point Club and Community Association, Inc., Melrose Property Owner's Association, Inc., and Bloody Point Property Owner's Association (collectively "POAs")—petitioned to intervene in the case.[1]

DIUC last requested a rate increase in June 2011. The same POAs intervened in that case and, during the merits hearing, were able to negotiate a settlement agreement with DIUC to which ORS did not object. Under the terms of the agreement, DIUC stipulated it would not file another application for rate increases before July 1, 2014. Based upon the evidence at the hearing and the parties' agreement that DIUC would be able to provide services to its customers while earning a fair and reasonable operating margin and return on equity ("ROE") under the proposed rates, the Commission approved the settlement in July 2012.

Prior to and while the 2011 rate case was pending, DIUC encountered a few unanticipated tax issues. Because the South Carolina Department of Revenue did not initially recognize DIUC as a utility, it did not begin assessing the ten and a half percent utility property tax against DIUC until 2012. Thus, instead of its expected property tax bill of approximately $10,000, in August 2012 DIUC received a bill for $132,398, with back taxes for 2010 and 2011 exceeding $230,600. Due to the substantial increase in its tax liability and its inability to seek further revenue increases until July 2014, DIUC entered

---

1. Beach Field Properties, LLC also submitted a petition to intervene in this case which was granted. However, Beach Field did not actively participate in the case—it submitted no pre-filed testimony, presented no evidence at the hearing, refused to cross examine witnesses, nor was it party to the Settlement Agreement between ORS and the POAs—and it is not a party to this appeal.

into an agreement with Beaufort County to pay the back taxes for years 2012, 2013, 2014, and the projected tax for 2015.[2] Specifically, Beaufort County agreed to allow DIUC to pay the full $526,843.39 in monthly installments of $5,487.95 ($65,856 a year) over eight years, with no interest. In addition to the $65,856 DIUC owes annually pursuant to its settlement with Beaufort County, DIUC presented testimony at the hearing that its annual property tax bill going forward will be approximately $192,300. Therefore, in total, DIUC requested additional revenue of $258,158 to cover its taxes for at least the next eight years.

DIUC faced a second tax problem when the county sent one of its property tax bills to the wrong address. As a result, the tax was never paid and Beaufort County initiated tax sale proceedings. The DIUC property in question contained a 125,000 gallon elevated water storage tank and a number of related facilities including a well, water pump, and system pipes. The property ("Elevated Tank Site") was sold at a tax sale in October 2010 to Mamdouh Sabry Abdelrahman (Sabry), however, DIUC did not discover the property had been sold until early 2012.[3]

■ Critical to this case is the ownership of the elevated water tank, well, water pump, system pipes, and other DIUC equipment located on the Elevated Tank Site. Although the tax deed purported to convey the property "all and singular ... with the appurtenances," DIUC presented testimony from the Beaufort County Treasurer, Maria Walls, that the tax deed did not convey "the elevated water tank, the well, the water pump, system pipes, or other DIUC property located on the Elevated Tank[ ] Site." According to Walls, DIUC's ownership of all the equipment located on the property remained unaffected by the tax sale to Sabry. Despite providing no

---

**2.** Although utility property taxes were also assessed against DIUC for 2010 and 2011, as part of the settlement agreement Beaufort County agreed to write-off the taxes for those two years.

**3.** After numerous attempts to negotiate with Sabry for the return of the Elevated Tank Site, DIUC instituted a condemnation action. The circuit court granted summary judgment in favor of DIUC to pursue condemnation, and the court of appeals affirmed in an unpublished opinion. *Sabry Abdelrahman v. Daufuskie Island Util. Co.,* No. 2016-UP-301, 2016 WL 3342316 (Ct. App. June 15, 2016).

evidence to the contrary to support its recommendation, ORS nevertheless proposed excluding the value of the utility equipment located on the property when calculating DIUC's rate base [4] and property taxes.

A hearing on the merits of DIUC's application was held in October 2015. The day before the hearing, the POAs filed a Settlement Agreement they had entered with ORS for the Commission's consideration. Pursuant to the Agreement, ORS and the POAs stipulated to each party's testimony and exhibits in the record, and the parties agreed to accept all of ORS's adjustments and recommendations, with the exception of the bad debt expense for which they agreed to adopt DIUC's proposal.[5] At the hearing, DIUC objected to the admission of the Settlement Agreement, arguing it was irrelevant and prejudicial because it bolstered ORS's recommendations without providing any new or additional evidence to support them. Over DIUC's objection, the Commission admitted the Agreement, reasoning it was more probative than prejudicial.

Following the hearing, the Commission issued an order explicitly adopting the Settlement Agreement and granting DIUC a revenue increase subject to all of ORS's adjustments, except for the bad debt expense. Shortly thereafter, DIUC filed a petition for reconsideration and/or rehearing, arguing it would be forced into default and bankruptcy if compelled to implement the rates specified in the Commission's order. Additionally, DIUC requested the Commission reconsider

---

4. " '[R]ate base' is the amount of investment on which a regulated public utility is entitled to an opportunity to earn a fair and reasonable return," and "represents the total investment in, or the fair value of, the used and useful property which it necessarily devotes to rendering the regulated services." *S. Bell Tel. & Tel. Co. v. Pub. Serv. Comm'n of S.C.,* 270 S.C. 590, 600, 244 S.E.2d 278, 283 (1978) [hereinafter *Southern Bell*].

5. Somewhat ironically, the bad debt expense was one of the ORS adjustments which DIUC was willing to accept. ORS originally recommended the bad debt expense be raised to $108,349. Although DIUC's calculations also indicated the bad debt expense to be over $100,000, in an effort to be conservative in its request, DIUC only proposed to recoup $30,852 of the bad debt expense. Despite ORS's original determination that the bad debt expense exceeded $100,000 and the uncontroverted evidence presented at the hearing supported the higher amount, the Commission held DIUC to its original request of $30,852.

adopting ORS's adjustments to the property taxes, management fees, rate case expenses, bad debt expense, and rate base.[6]

The Commission denied DIUC's petition, holding (1) the issue of inevitable default could not be raised for the first time in a petition for rehearing; and (2) ORS's accounting methods and adjustments were in keeping with accepted regulatory principles and supported by substantial evidence. DIUC then filed a direct appeal to this Court to review the Commission's order.

## ISSUES PRESENTED

1) Did the Commission err by admitting into evidence and adopting the proposed Settlement Agreement between ORS and the POAs to which DIUC was not a party and which granted only thirty-nine percent of DIUC's requested revenue increase?

2) Were the Commission's findings of fact and conclusions with respect to property taxes, management fees, rate case expenses, rate base, and bad debt supported by substantial evidence in the record?

3) Did the Commission err in denying DIUC's petition for rehearing on the grounds that DIUC will inevitably default on its loans if the rates established in the Commission's order are not modified?

## STANDARD OF REVIEW

This Court affords great deference to the Commission's ratemaking decisions and " 'will not substitute [its] judgment for that of the [Commission] where there is room for a difference of intelligent opinion.' " *Utils. Servs. of S.C., Inc. v. S.C. Off. of Reg. Staff*, 392 S.C. 96, 103, 708 S.E.2d 755, 759 (2011) (quoting *Kiawah Prop. Owners Group v. Pub. Serv. Comm'n of S.C.*, 357 S.C. 232, 237, 593 S.E.2d 148, 151 (2004)) [hereinafter *Utilities Services*]. "The [Commission] is considered the 'expert' designated by the legislature to make policy

---

6. DIUC makes the same arguments with respect to each of these issues in the instant appeal. For the sake of clarity, the facts pertaining to each will be presented more fully *infra*.

determinates regarding utility rates...." *Kiawah Prop. Own-ers Group v. Pub. Serv. Comm'n of S.C.*, 359 S.C. 105, 109, 597 S.E.2d 145, 147 (2004) (quoting *Hamm v. S.C. Pub. Serv. Comm'n*, 289 S.C. 22, 25, 344 S.E.2d 600, 601 (1986)) (internal quotations omitted). Thus, the Commission's decision shall be affirmed as long as it is supported by the substantial evidence in the record. *S.C. Energy Users Comm'n v. S.C. Electric & Gas*, 410 S.C. 348, 353, 764 S.E.2d 913, 915 (2014). Neverthe-less, the Court may reverse or modify the Commission's order if it is based upon an error of law or is "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record," such that Petitioner's substantial rights have been prejudiced. S.C. Code Ann. § 1-23-380(5)(d), (e) (Supp. 2016); *Utilities Services*, 392 S.C. at 103–04, 708 S.E.2d at 759.

## LAW/ANALYSIS

### I. SETTLEMENT AGREEMENT

 DIUC first argues the Commission committed revers-ible error in admitting the Settlement Agreement into evi-dence and adopting the Agreement in toto. Specifically, DIUC contends the Commission violated S.C. Code Ann. Regs. 103-846 (2012), SCRE 401, 402, 403, and the Commission's Settle-ment Policies and Procedures (2006).[7] We agree.

Regulation 103-846 states that "[i]rrelevant, immaterial or unduly repetitious evidence shall be excluded" and the civil rules of evidence shall apply in the hearings before the Commission. S.C. Code Ann. Regs. 103-846. Evidence is rele-vant if it has "any tendency to make the existence of any fact that is of consequence ... more probable or less probable than it would be without the evidence." SCRE 401. Although all relevant evidence is generally admissible, subject to certain exceptions, irrelevant evidence is never admissible. SCRE 402. Additionally, relevant evidence must be excluded when its

---

7. DIUC offers two additional arguments on this issue. However, be-cause our analysis under DIUC's first argument is dispositive, it is unnecessary for us to reach the merits of the remaining two. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address additional issues when the dispo-sition of the first issue is dispositive).

probative value is substantially outweighed by the danger of unfair prejudice, confusion, or needless repetition. SCRE 403.

DIUC's arguments under Regulation 103-846 and Rules of Evidence 401, 402, and 403 are practically identical. Because the Settlement Agreement was entered into by only ORS and the POAs, DIUC rightly asserts the agreement did not resolve any of the issues before the Commission. Additionally, DIUC notes the Settlement Agreement contains no evidence related to the rate adjustments at issue, and is therefore irrelevant and immaterial. Furthermore, DIUC argues the Settlement Agreement was unfairly prejudicial in that it bolstered ORS's proposals and attempted to usurp the Commission's fact-finding power to determine the appropriate rates.

We agree the Settlement Agreement was not relevant evidence as defined in Rule 401, and was therefore inadmissible at the hearing. S.C. Code Ann. Regs. 103-846; SCRE 401. The Settlement Agreement contained no factual evidence or stipulations related to DIUC's revenue increase requests. Moreover, the Settlement Agreement did not resolve any issues before the Commission because DIUC, the applicant seeking rate increases, was not party to the agreement. At most, the Settlement Agreement indicated to the Commission that were it to adopt ORS's recommended adjustments, the POAs would not appeal. However, a party's agreed reaction to a speculative future order of the Commission is irrelevant to the pivotal issue at the hearing—the necessity and reasonableness of DIUC's requested revenue increases. Therefore, the Commission erred in admitting and considering the Settlement Agreement.

■ DIUC also contends the Commission violated its own Settlement Policies and Procedures by adopting the Settlement Agreement. According to the Commission's revised settlement guidelines, it may approve settlements "[w]hen all parties to a proceeding reach agreement with regard to all issues in the form of a settlement signed by all parties or their representatives...." Additionally, the Commission may not approve a settlement unless it is supported by substantial evidence presented to the Commission at a hearing.

■ As discussed above, this agreement was not a true settlement because all parties did not embrace it. Even the

POAs' counsel recognized at the hearing that the Settlement Agreement did not resolve *any* issues between the parties, but rather was merely an agreement between the POAs and ORS not to object to one another's pre-filed testimony, and to accept ORS's recommendations and adjustments should the Commission adopt them. Furthermore, the Settlement Agreement contained multiple adjustments which were entirely unsupported by the evidence presented to the Commission. Therefore, we hold the Commission erred in approving and adopting the Settlement Agreement and DIUC is entitled to a new hearing in which the parties may present any additional evidence.[8] While we are reversing and remanding for a new hearing as to all issues, in order to provide guidance to the Commission on remand, we address three allegations of error raised by DIUC in this appeal.

## II. COMMISSION'S FINDINGS ON THE MERITS

### A. *Rate Base Includes Elevated Tank Site*

 In its order, the Commission expressly rejected DIUC's proposed rate base, which included the value of the equipment on the Elevated Tank Site, due to the "murky" impact of the tax sale on the ownership of that equipment. DIUC argues this was an error of law in light of Walls' uncontroverted testimony that the tax deed to Sabry did not convey the water tank or other utility equipment on the property. We agree.

 In reaching its decision, the Commission must consider all the testimony and evidence presented to it. *Southern Bell*, 270 S.C. at 598, 244 S.E.2d at 282. The credibility and weight of the evidence submitted is particularly within the

---

8. Furthermore, we take this opportunity to overturn *Parker v. South Carolina Public Service Commission*, 288 S.C. 304, 307, 342 S.E.2d 403, 405 (1986), to the extent it holds the Commission may consider new evidence on remand only if explicitly authorized to do so by an appellate court. We now hold that a remand to the Commission for a new hearing necessarily grants the parties the opportunity to present additional evidence. Rate cases are heavily dependent upon factors which are subject to change during the pendency of an appeal, thus it serves no purpose to bind parties to evidence presented at the initial hearing which may no longer be indicative of the current economic realities on remand.

Commission's purview. *Id.* However, "evidence should be believed unless there is some reason for discrediting it." *Id.* Moreover, if all the evidence points to one conclusion or the Commission's findings "are based on surmise, speculation or conjecture, then the issue becomes one of law for the court. . . ." *Polk v. E.I. duPont de Nemours Co.*, 250 S.C. 468, 475, 158 S.E.2d 765, 768 (1968); *see also Randolph v. Fiske-Carter Constr. Co.*, 240 S.C. 182, 189, 125 S.E.2d 267, 270 (1962) (holding where there is absolutely no evidence to support the Commission's findings, the issue becomes a question of law).

We find the Commission's conclusion that the "murky" ownership of the equipment located on the Elevated Tank Site precludes DIUC from including the value of that property in its rate base is unsupported by the substantial evidence in the record. The only evidence submitted regarding ownership of the equipment came from Walls, who unequivocally stated the tax deed did not convey the utility equipment. Thus, we discern nothing in the record to suggest the ownership status of the water tank and utility property is "murky." Rather, the evidence before the Commission is quite clear—DIUC owns the utility equipment located on the Elevated Tank Site, and is therefore entitled to include the value of this property in its rate base. On remand when the Commission recalculates DIUC's rate base, it should take into account its ownership of the water tank, well, pipes, and other utility equipment located on the Elevated Tank Site.

### B. Property Tax Expense

 Pursuant to its settlement with Beaufort County to discharge back taxes assessed from 2012 through 2015, DIUC requested $526,848 amortized over eight years—$65,856 annually. Additionally, DIUC calculated its annual property tax bill for 2016 to be $192,302. Therefore, DIUC proposed a total property tax expense of $258,158.

ORS recommended only allowing DIUC to recover back taxes for 2012 and 2013, receiving $244,899 amortized over eight years—$30,612 annually. ORS also proposed an additional $140,880 for the 2014 property taxes, since that was DIUC's

test year. Specifically, ORS declined to recommend a separate or additional amount for the 2015 property taxes because DIUC had not yet been billed for the 2015 taxes, despite the fact the 2015 taxes were included in the Beaufort County settlement amount. The Commission adopted ORS's proposed property tax expenses, finding they were based on "known and measurable amounts." With respect to the 2015 taxes, the Commission stated:

[W]e do not believe the 2015 amounts should be covered by ratepayers. The 2015 tax bill is not due until 2016 and this Commission notes that [DIUC's] settlement agreement with Beaufort County has already been amended once, and could be amended in the future.

DIUC argues the Commission erred as a matter of law by ignoring the known and binding tax expenses under the settlement agreement with Beaufort County as well as the calculable property taxes for 2016. DIUC further asserts the Commission's conclusion that the settlement agreement could be amended in the future to reduce DIUC's tax liability is not only speculative, but directly contrary to the evidence in the record. We agree.

When considering test-year data, "the Commission should make any adjustments for known and measurable changes in expenses, revenues and investments occurring after the test year, in order that the resulting rates will reflect the actual rate base, net operating income, and cost of capital" of an applicant. *Southern Bell*, 270 S.C. at 602, 244 S.E.2d at 284. Similarly, atypical situations or events occurring in the test year should be normalized to reflect usual conditions. *Parker v. S.C. Pub. Serv. Comm'n*, 280 S.C. 310, 312, 313 S.E.2d 290, 292 (1984). Furthermore, if the Commission's findings are "predicated on unforeseeable future events, [they] must be reversed as speculative." *S.C. Energy Users Committee v. Pub. Serv. Comm'n of S.C.*, 332 S.C. 397, 399, 505 S.E.2d 342, 343 (1998).

By adopting ORS's adjustments, the Commission completely disregarded DIUC's binding obligation under the settlement

agreement with Beaufort County in order to conform more closely to the 2014 test year. However, as this Court made clear in *Parker* and *Southern Bell*, significant known expenses incurring after the test year must be taken into account to give the Commission the most accurate view of the applicant's status. *See Parker*, 280 S.C. at 312–13, 313 S.E.2d at 292; *Southern Bell*, 270 S.C. at 602, 244 S.E.2d at 284. An annual bill of $65,856 for back taxes alone is a substantial expense for which the Commission should have adjusted the test year data. Moreover, the Commission's suggestion that DIUC may be able to reduce its tax liability by renegotiating with Beaufort County in the future is purely speculative, especially in light of Walls' testimony indicating the County would not be willing to amend the terms of the settlement agreement. Therefore, we would reverse the Commission's adoption of ORS's property tax expense adjustment.[9]

## C. Bad Debt Expense

When DIUC originally calculated its bad debt expense at the end of the 2014 test year, it totaled $105,667. Nevertheless, in an attempt to be conservative in its application, DIUC only requested revenue increases to cover $30,852 of the bad debt expense. ORS calculated DIUC's bad debt at $108,349 and initially recommended DIUC's proposed amount be adjusted upward, which, unsurprisingly, DIUC was willing to accept. However, in the Settlement Agreement with the POAs, ORS revised its recommendation to conform to DIUC's requested amount of $30,852.[10] The Commission accepted

---

9. We note the Commission rejected DIUC's property tax expense in part due to the "questionable ownership status" of the utility equipment located on the Elevated Tank Site. Because the substantial evidence indicates DIUC owns the utility property on that site, any additional property taxes attributable to that equipment should also be taken into account in the assessment of future taxes.

10. We note DIUC submitted pre-filed testimony accepting ORS's bad debt adjustment more than two and half weeks before the Settlement Agreement was filed. Presumably, DIUC intended to concede ORS's bad debt expense proposal of $108,349 at the hearing, but was blindsided by the Settlement Agreement in which ORS and the POAs adopted DIUC's previously requested bad debt expense.

DIUC's bad debt request of $30,852, concluding it was a reasonable amount "because it encourages DIUC to collect those debts it is owed." DIUC now contends the Commission erred in awarding only $30,852 to cover its bad debt expense because all the evidence in the record establishes DIUC's bad debt expense exceeds $100,000. We agree.

There is no evidence in the record indicating DIUC's actual bad debt expense is anywhere near $30,852. Rather, all the testimony and exhibits presented by DIUC and ORS show DIUC had been unable to collect well over $100,000 in bad debt. DIUC explained the reason it requested such a low bad debt recovery amount was to achieve some balance in its rate increase requests. Additionally, we are troubled by the fact that this is the only request for which the Commission did not accept ORS's adjustment, especially in light of DIUC's pre-filed testimony agreeing to ORS's recommended $108,349. Therefore, we find the Commission's decision to allow a bad debt expense of $30,852 is unsupported by the evidence in the record.

## CONCLUSION

For the foregoing reasons, we conclude the Commission erred in admitting into evidence and adopting the Settlement Agreement between ORS and the POAs. Therefore, we reverse and remand to the Commission for a de novo hearing.

BEATTY, C.J., KITTREDGE and FEW, JJ., concur.
Acting Justice Costa M. Pleicones, concurring in result only.