# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Daufuskie Island Utility Company, Inc., Appellant,

v.

South Carolina Office of Regulatory Staff, Haig Point Club and Community Association, Inc., Melrose Property Owner's Association, Inc., Blood Point Property Owner's Association, and Beach Field Properties, LLC, Respondents.

Appellate Case No. 2022-000463

———————

Appeal from the Public Service Commission

———————

Opinion No. 28176
Heard March 30, 2023 – Filed August 30, 2023

———————

**AFFIRMED**

———————

Thomas P. Gressette Jr. and George Trenholm Walker, both of Walker Gressette Freeman & Linton, LLC, of Charleston, for Appellant.

Andrew McClendon Bateman, Benjamin Parker Mustian, and Steven W. Hamm, all of Columbia, for Respondent the South Carolina Office of Regulatory Staff; and John Julius Pringle Jr. and Lyndey Ritz Zwing Bryant, both of Adams and Reese LLP, of Columbia, for Respondents the Haig Point Club and Community Association, Inc., Melrose Property Owner's Association, Inc., and Bloody Point Property Owner's Association.

**JUSTICE KITTREDGE:** This case is the third appeal of the Daufuskie Island Utility Company (DIUC) from decisions by the Public Service Commission (PSC) regarding DIUC's 2015 application for ratemaking. In the PSC's first two decisions, it granted only part of the 109% rate increase requested by DIUC. DIUC appealed both decisions, and both times, this Court reversed and remanded to the PSC for further consideration. On the final remand, the parties entered a settlement agreement allowing DIUC to recover rates equivalent to the 109% rate increase it initially requested in 2015. However, the parties continued to disagree over the propriety of DIUC's additional request for a "reparations surcharge"—essentially, a request to retroactively recover the 109% rate increase from the date of the PSC's first order, rather than from the date of the PSC's acceptance of the settlement agreement. The PSC rejected DIUC's request for the reparations surcharge, finding it would amount to impermissible retroactive ratemaking. The propriety of the reparations surcharge is the only matter at issue in this appeal.

We find the General Assembly has not authorized the PSC to grant utilities relief via a reparations surcharge, and the PSC therefore correctly rejected DIUC's request. A utility's exclusive remedy to collect higher rates during the pendency of an appeal (or multiple appeals, as in this case) is set forth in section 58-5-240(D) of the South Carolina Code, which requires the utility to either secure an appellate bond or make "other arrangements satisfactory to the [PSC]."[1] DIUC chose not to avail itself of the statutory remedy prior to this final appeal. Accordingly, we affirm the decision of the PSC and end this lengthy ratemaking process.

## I.

## A.

DIUC provides water and sewer service to Daufuskie Island in Beaufort County. In June 2015, DIUC filed a ratemaking application (the 2015 application), seeking an increase in revenue of $1,182,301—a 109% increase in its prior rates.[2] In December

---

[1] *See* S.C. Code Ann. § 58-5-240(D) (2015) ("If . . . the utility shall appeal from the [PSC's] order[] by filing with the [PSC] a petition for rehearing, the utility may put the rates requested in its schedule into effect under bond only during the appeal and until final disposition of the case . . . or there may be substituted for the bond other arrangements satisfactory to the [PSC] for the protection of parties interested.").

[2] For comparison, in its prior ratemaking application in 2011, DIUC requested a 37%

2015, the PSC granted DIUC around 39% of the revenue increase requested, which amounted to an approximate 43% increase in the prior rates charged to ratepayers (the first order).

DIUC appealed the first order. Simultaneously, it filed a motion with the PSC for approval of an appellate bond pursuant to section 58-5-240(D). The PSC granted the motion and set a bond amount that would cover a one-and-a-half-year period, specifically leaving open the possibility for DIUC to extend the bonding period beyond that date if necessary depending on the length of the appeal. Thereafter, DIUC began charging under bond the full 109% increase in rates sought in the 2015 application.

This Court heard oral arguments in December 2016 and issued its decision in July 2017, reversing the first order on the merits and remanding to the PSC for a de novo hearing. *See Daufuskie Island Util. Co. v. S.C. Off. of Regul. Staff* (*DIUC I*), 420 S.C. 305, 320, 803 S.E.2d 280, 288 (2017).

**B.**

Following the remand, DIUC's appellate bond approached the initial expiration date, and DIUC claimed it was financially unable to secure the appellate bond for a longer period of time. DIUC therefore requested an expedited proceeding so it could continue collecting the higher rates requested in the 2015 application. While declining to rule outright that DIUC could not afford an extension of its appellate bond, the PSC erred "on the side of caution" and granted the request, issuing its second decision by December 2017 (the second order).

The second order granted DIUC additional revenue as compared to the first order—around 80% of the total revenue requested—amounting to an approximate 88% increase in rates to ratepayers as compared to the rates charged before the 2015 application was filed. Pursuant to section 58-5-240(D) and the expiration of the appellate bond, the second order also required DIUC to issue refunds to its customers for the "excess" rates collected during the appeal, i.e., the difference between the 109% increased rates DIUC had been charging and the 88% increased rates the PSC had approved in the second order. *See* S.C. Code Ann. § 58-5-240(D) ("In all cases in which a refund is due, the [PSC] shall order a total refund of the difference between the amount collected under bond and the amount finally approved.").

---

increase in its prior rates.

DIUC appealed the second order, contesting only the PSC's ruling regarding its denial of a portion of DIUC's rate case expenses (management fees and legal fees incurred in seeking the rate increase). Notably, DIUC did not seek a second appellate bond or propose "other arrangements satisfactory to the [PSC] for the protection of parties interested." *See id.* Moreover, DIUC never raised to either the PSC or this Court any argument about the impropriety of the refunds issued in the second order, its alleged inability to obtain an appellate bond, or the unfairness of forcing the utility to get an appellate bond it could not afford. As a result, DIUC began charging the 88% rate increase rather than the 109% rate increase it had been collecting during the first appeal and remand.

Following oral arguments in April 2019, this Court issued its decision in July 2019, again reversing and remanding to the PSC for a de novo hearing. *See Daufuskie Island Util. Co. v. S.C. Off. of Regul. Staff* (*DIUC II*), 427 S.C. 458, 464, 832 S.E.2d 572, 575 (2019). However, in stark contrast to *DIUC I*, the Court explained its decision to reverse and remand a second time was not based on the merits of DIUC's arguments on appeal and should not be read to suggest the Court's views on the merits. *Id.*

## C.

Following the second remand, the PSC accepted the parties' settlement agreement allowing DIUC to collect rates equivalent to the 109% rate increase requested in the 2015 application (the third order). However, the breakdown of the rates requested in the 2015 application and those granted in the third order were vastly different from one another.[3] Nonetheless, the PSC agreed with the parties that the rates were

---

[3] For example, although not an exhaustive list, (1) the rate base approved in the third order was over $1,000,000 lower than that requested in the 2015 application; (2) the rate of return granted was over 1.25% lower than requested; and (3) the rate case expenses approved were over $700,000 higher than the initial request due to the length and complexity of the various appeals. The $700,000 increase in rate case expenses alone was particularly notable given that DIUC had requested a total revenue increase of around $1,200,000; in other words, the increase in rate case expenses amounted to 61% of the total revenue increase requested by DIUC in its 2015 application (and the total revenue increase ultimately granted in the third order).

"just and reasonable and [would] allow [DIUC] the opportunity to earn a reasonable rate on the basis of its [2015 application]."

**D.**

The settlement agreement and third order resolved all of the outstanding issues between the parties except one: the propriety of DIUC's request for a reparations surcharge. The requested surcharge consisted of two parts. The first part centered around the refund issued to DIUC customers after the second order and expiration of the appellate bond. Specifically, DIUC claimed that since it had ultimately been granted the ability to collect rates equivalent to the 109% rate increase sought in the 2015 application, the earlier refund—the difference between the 109% increase collected under bond and the 88% increase approved in the second order—was improperly credited to the ratepayers. The second part of the surcharge involved the period of time between the issuance of the second and third orders. During that time, due to DIUC's failure to secure an appellate bond or make "other arrangements satisfactory to the [PSC]," DIUC charged its customers the 88% rate increase granted in the second order. However, DIUC later contended that, because the third order approved rates equivalent to the 109% increase originally requested, it should have been able to charge the full 109% rate increase all along.[4]

Ultimately, the PSC denied DIUC's request for a reparations surcharge in a thoughtful and detailed order (the fourth order). In relevant part, the PSC found the reparations surcharge amounted to illegal retroactive ratemaking. The PSC explained DIUC's sole statutory remedy was set forth in section 58-5-240(D), and that statute did not authorize the award of a reparations surcharge. The PSC believed section 58-5-240(D) provided DIUC's sole statutory remedy for two reasons: (1) "[w]hen a statute creates a substantive right and provides a remedy for infringement of that right, the plaintiff is limited to that statutory remedy," quoting *Dockins v. Ingles Markets, Inc.*, 306 S.C. 496, 498, 413 S.E.2d 18, 19 (1992); and (2) section 58-5-240(D) was the General Assembly's sound policy declaration to balance the interests of utilities and their customers, and should the PSC fail to require compliance with the statute, it "would signal to utilities that they need not follow the

_____

[4] Recall DIUC was able to charge the 109% rate increase during the pendency of the first appeal due to securing an appellate bond pursuant to section 58-5-240(D). Therefore, it was only between the issuance of the second and third orders that DIUC did not charge its ratepayers the 109% increase.

bond statute and still may recover additional monies" via a belated reparations surcharge.

The PSC additionally noted that although the revenue increase requested in the 2015 application and the revenue increase approved in the third order were nearly identical *in total*, the *composition* of the figures was "dramatically different," and, therefore, "the similarities between revenue settled upon and revenue originally applied for [did] not indicate that the rates DIUC originally applied for were *de facto* just and reasonable." Thus, the PSC held DIUC did not have lost revenue it was entitled to collect during the second appeal because DIUC did not establish its right to those revenues until the third order was issued.[5]

DIUC directly appealed the fourth order to this Court pursuant to Rule 203(d)(2)(A), SCACR.

## II.

In an appeal from the PSC, the Court's review is governed by section 1-23-380 of the South Carolina Code (Supp. 2022). *Duke Energy Carolinas, L.L.C. v. S.C. Off. of Regul. Staff*, 434 S.C. 392, 406, 864 S.E.2d 873, 880 (2021). "Pursuant to that statute, the Court may not substitute its judgment for an agency's judgment as to the weight of the evidence on questions of fact." *Id.* (citing S.C. Code Ann. § 1-23-380(5)). Rather, the Court may only reverse or modify a decision of the PSC

---

[5] In particular, DIUC specifically agreed in the third order to forgo recovery of certain rate base expenses related to a utility plant in service. However, DIUC nonetheless ensured the revenue increase approved in the third order matched that of the increase sought in the 2015 application by substituting the value of the utility plant in service for rate case expenses incurred during the various appeals. The PSC found that substitution noteworthy because the updated rate case expenses making up the final revenue increase approved were either not incurred by the utility until after *DIUC II* or not shown to be just and reasonable until the parties reached the settlement encompassed by the third order. As a result, the PSC explained DIUC was not entitled to a reparations surcharge for the time period between the issuance of the second and third orders because the calculation of the surcharge was "based either on [the utility plant in service] it agreed not to seek or rate case expenses that were unrecoverable until the third proceeding."

"when the findings or conclusions are affected by an error of law, clearly erroneous, or arbitrary and capricious." *Id.* (citing S.C. Code Ann. § 1-23-380(5)(d)–(f)).

The Court must view the PSC's findings on appeal as "presumptively correct." *S.C. Energy Users Comm. v. S.C. Pub. Serv. Comm'n*, 388 S.C. 486, 491, 697 S.E.2d 587, 590 (2010). Thus, "the party challenging the [PSC's] order bears the burden of convincingly proving the decision is clearly erroneous, or arbitrary or capricious, or an abuse of discretion, in view of the substantial evidence of the record as a whole." *Id.*

## III.

We first address the portion of the reparations surcharge related to DIUC's attempt to recoup the ratepayer refund required by the second order after the expiration of DIUC's appellate bond. The PSC found DIUC did not challenge the propriety of the refund in the second appeal and, therefore, the ruling in the second order finding refunds were necessary and proper had become the law of the case. DIUC does not directly challenge that ruling here, making no attempt in its brief to this Court to argue why the law-of-the-case doctrine does not apply. As a result, we affirm the PSC's finding that the refund portion of the surcharge must be denied. *See Atl. Coast Builders & Contractors, L.L.C. v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) ("[A]n unappealed ruling, right or wrong, is the law of the case."); *Transp. Ins. Co. v. S.C. Second Inj. Fund*, 389 S.C. 422, 431, 699 S.E.2d 687, 691 (2010) ("An unappealed ruling is the law of the case and requires affirmance.").

## IV.

As to the second portion of the reparations surcharge—involving DIUC's request to charge the 109% rate increase between the issuance of the second and third orders—DIUC argues that without this portion of the surcharge, the third order does not make the utility whole. More specifically, DIUC contends the third order permitted DIUC to collect rates equivalent to the full increase requested in the 2015 application, and the utility therefore should have been able to collect that amount starting on the date of the first order, regardless of any appeals. Additionally, DIUC claims it was fiscally impossible for it to secure an appellate bond between the issuance of the second and third orders, and thus, it would be unfair to require strict compliance with section 58-5-240(D). We disagree for several reasons, finding such compliance is the only avenue under which DIUC could have sought relief here.

Once the PSC issues a ruling disallowing the full rates requested by a utility in a ratemaking application, the only mechanism for the utility to collect the revenue it requested is provided in section 58-5-240(D). *See generally* S.C. Code Ann. § 58-5-240 (providing a utility is not entitled to the revenue requested in a ratemaking application until one of three things occurs: (1) pursuant to subsection A, the PSC specifically approves those rates; (2) pursuant to subsection E, the PSC fails to timely rule on the application; or (3) pursuant to subsection D—which only applies after the PSC disallows the higher rates in whole or in part—the utility takes certain actions that would protect ratepayers from improperly overpaying). Accordingly, DIUC's compliance with subsection D is the only method which could entitle it to the reparations surcharge.

Section 58-5-240(D) provides, in relevant part:

> If . . . the utility shall appeal from the [PSC's] order[] by filing with the [PSC] a petition for rehearing, *the utility may put the rates requested in its schedule into effect under bond only during the appeal and until final disposition of the case.* Such bond must be in a reasonable amount approved by the [PSC], with sureties approved by the [PSC], conditioned upon the refund, in a manner to be prescribed by order of the [PSC], to the persons, corporations, or municipalities, respectively, entitled to the amount of the excess, if the rate or rates put into effect are finally determined to be excessive; *or there may be substituted for the bond other arrangements satisfactory to the [PSC] for the protection of parties interested.* During any period in which a utility shall charge increased rates under bond, it shall provide records or other evidence of payments made by its subscribers or patrons under the rate or rates which the utility has put into operation in excess of the rate or rates in effect immediately prior to the filing of the schedule.
>
> All increases in rates put into effect under the provisions of this section which are not approved and for which a refund is required shall bear interest at a rate of twelve percent per annum.
>
> The interest shall commence on the date the disallowed increase is paid and continue until the date the refund is made.
>
> In all cases in which a refund is due, the [PSC] shall order a total refund of the difference between the amount collected under bond and the amount finally approved.

*Id.* § 58-5-240(D) (emphasis added).

Thus, section 58-5-240(D) contemplates two possible routes for a utility to collect higher rates during an appeal once the PSC has disallowed revenues sought in a ratemaking application: the first is securing an appellate bond, and the second is making "other arrangements satisfactory to the [PSC] for the protection of parties interested." There are no other options or exceptions set forth in that subsection of the statute. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning. . . . [C]ourts are bound to give effect to the expressed intent of the legislature." (cleaned up)).

As the PSC explained, "When a statute creates a substantive right and provides a remedy for infringement of that right, the [injured party] is limited to that statutory remedy." *Dockins*, 306 S.C. at 498, 413 S.E.2d at 19. Various provisions in the South Carolina Code—including section 58-5-240—provide utilities the right to be protected from excessive regulatory lag (the delay in time between when a ratemaking application is filed and when a utility can collect the higher revenues in the application). As a result, should a utility wish to protect itself against the ills of regulatory lag, it is limited to those remedies set forth in the statutes. None of those remedies include a reparations surcharge, and therefore, the PSC has no authority to grant a utility equitable relief via such a surcharge. *See Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298 S.C. 179, 185, 379 S.E.2d 119, 123 (1989) (explaining section 58-5-240(D) only allowed for the imposition of an appellate bond on a utility who had not fully prevailed before the PSC, and therefore, the PSC lacked the equitable authority to impose an appellate bond on a utility who had fully prevailed).

Were we to agree with DIUC and allow a utility to collect a reparations surcharge following a successful appeal, it would entirely obviate the need for a utility to ever secure an appellate bond or make "other arrangements," thus placing all the risk on ratepayers and none on the utility. Given the clear system of checks and balances set forth in section 58-5-240(D) weighing the competing interests of utilities and their customers, we reject the suggestion that the General Assembly intended a utility to circumvent the protections afforded ratepayers. *See Utah Power & Light Co. v. Idaho Pub. Utils. Comm'n*, 685 P.2d 276, 281, 284–85 (Idaho 1984) (finding that if a utility were entitled to a surcharge or other monetary relief whenever a public utilities commission order was set aside upon appeal, its failure to follow the statutory process for obtaining a stay of the commission's initial order would be meaningless; noting the relevant statutes provided only prospective relief and did

not give the utilities commission the "authority to prescribe surcharges or reductions to otherwise reasonable rates in order to make up past revenue shortfalls due to confiscatory rates"; and noting that allowing a surcharge following reversal would destroy the protections afforded to ratepayers by the state's appellate bond statute); *Pub. Serv. Comm'n v. Diamond State Tel. Co.*, 468 A.2d 1285, 1300 (Del. 1983) ("[W]e find no statutory authority, and hence no legislative intent, that retrospective rate-making may be judicially mandated—even upon a judicial determination of Commission error in rejecting a rate application. . . .  [However, Delaware has an appellate bond statute similar to South Carolina's section 58-5-240(D).]  The provision of this form of remedial relief from an erroneous commission order thereby serves two purposes: (1) it provides a meaningful form of relief in the event of a successful appeal; and (2) *it suggests, at the very least, that the Legislature did not intend to permit recoupment through rate surcharge as an alternative means of appellate redress for an erroneous commission ruling.*" (emphasis added)).[6]

Thus, we conclude the PSC correctly found that DIUC's sole remedy is that provided in section 58-5-240(D).  In doing so, we find it notable that DIUC exclusively relied on the appellate bond option set forth in section 58-5-240(D) and never explored the second option available, that being to seek "other arrangements satisfactory to the

---

[6] *Cf. Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 563 P.2d 588, 604 (N.M. 1977) ("This is an issue of first impression in New Mexico.  However, this court has held that rate-making is legislative in its nature, and it is axiomatic that legislative action operates prospectively, not retroactively.  Retroactive remedies, which are in the nature of reparations rather than rate-making, are peculiarly judicial in character, and as such are beyond the authority of the Commission to grant." (internal citation omitted)); *Bristol Cnty. Water Co. v. Harsch*, 386 A.2d 1103, 1108 (R.I. 1978) (affirming the denial by the state utilities commission of a reimbursement in a utility's next rate order for errors in a previous rate order; and explaining that because rates are prospective in nature, they "may not be designed to recoup past losses": "The rule prohibiting the imposition of retroactive rates holds true despite the fact that the company's loss might be attributable to the inevitable result of a regulatory lag."); Stefan H. Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings*, 1991 U. Ill. L. Rev. 983, 998 (1991) ("*Even if the court reverses a rate order on appeal*, the court remands the case to the commission to fix rates for the future.  Once the commission fixes rates, . . . *any changes can be prospective only*." (emphasis added)).

[PSC]."[7]  This second (and presumably cheaper) option was specifically drawn to DIUC's attention during the proceedings before the PSC, yet DIUC chose not to pursue it despite its alleged inability to pay for an extension of its appellate bond. Given the clear options set out in section 58-5-240(D), it was incumbent upon DIUC to either secure an appellate bond or request "other arrangements."  DIUC's failure to do so here is fatal to its request for a reparations surcharge.[8]

## V.

As a final matter, the parties hotly contested whether our decision should be guided by *South Carolina Electric & Gas Co. v. Public Service Commission* (hereinafter *SCE&G*)[9] or *Hamm v. Central States Health & Life Co.* (hereinafter *Central*

---

[7] *See, e.g.*, *In re Blue Granite Water Co.*, 434 S.C. 180, 203, 862 S.E.2d 887, 899 (2021) (explaining that under section 58-5-240(D), and with the PSC's approval, the utility created a "deferred account for a regulatory asset that would increase at a rate of . . . the difference between the rates approved in the PSC's order . . . and the rates originally requested in [the utility's] application.  Then, assuming [the utility] prevailed on appeal, it would be able to recover the amount in the deferred account in a future ratemaking case."); Krieger, *supra* note 6, at 1015–16 ("The courts that have addressed [whether the creation of a deferred account constitutes retroactive ratemaking] have found no retroactive ratemaking problem. . . .  [They] reasoned that retroactive ratemaking only applies to adjustments in past rates; because [utilities commissions do] not take[] into account the expenses of a [deferred account] in past rates, [the commissions are] free to consider the deferred expenses in setting future rates." (footnote omitted)).

[8] We additionally note our disapproval of the timeliness of DIUC's request for a reparations surcharge.  Specifically, during the second appeal, DIUC did not argue that its inability to afford an appellate bond rendered section 58-5-240(D) inapplicable on equity grounds.  *See Foggie v. CSX Transp., Inc.*, 315 S.C. 17, 23, 431 S.E.2d 587, 590 (1993) (determining a particular argument was unpreserved because it was not raised at the petitioner's first opportunity to do so).  While we do not base our holding as to this part of the reparations surcharge on issue preservation grounds today, we note for the future that parties should be mindful to raise and pursue issues at their first opportunity so that the relevant facts—here, DIUC's inability to afford an appellate bond or make "other arrangements"—are fresher and more easily vetted.

[9] 275 S.C. 487, 272 S.E.2d 793 (1980).

*States*).[10]  In *SCE&G*, the prior rates set were determined to be lawful and not subject to a refund; in *Central States*, the prior rates set were determined to be unlawful, and refunds were required.  *Compare SCE&G*, 275 S.C. at 491, 272 S.E.2d at 795, *with Central States*, 299 S.C. at 505–06, 386 S.E.2d at 253–54.

In this instance, neither *SCE&G* nor *Central States* is persuasive authority, for here, the Court did not reach the merits of the lawfulness of the rates set by the PSC.  *See DIUC II*, 427 S.C. at 464, 832 S.E.2d at 575.  The parties settled the case before the PSC could determine with finality whether the rates set in the second order were appropriate or confiscatory.  Rather than trying to squeeze this case into the precedent of *SCE&G* or *Central States*, we return to the overarching point that the PSC is a governmental agency of limited power and jurisdiction, and it may exercise only those powers expressly or impliedly conferred upon it by the General Assembly.  *Kiawah Prop. Owners Grp. v. Pub. Serv. Comm'n*, 359 S.C. 105, 109, 597 S.E.2d 145, 147 (2004).  As we explained above, the General Assembly has not authorized the PSC to issue reparations surcharges.  Rather, DIUC's remedy here lies exclusively with its compliance with section 58-5-240(D).  It is only within the framework set forth in that section that the PSC can offer relief to utilities seeking to collect higher rates during the pendency of an appeal.

## VI.

It is undeniable that due to statutory deadlines and the like, most ratemaking cases are resolved quickly, and the resultant regulatory lag is typically very short. Unfortunately, the regulatory lag here was significantly longer than normal, and the resultant delay in DIUC being able to increase its revenues was extensive. Nonetheless, given the unambiguous statutory scheme, we hold that section 58-5-240(D) provides the exclusive remedy for a utility seeking to collect higher revenues during the course of an appeal and thereby avoid excessive regulatory lag. DIUC knowingly chose not to comply with the statute, declining to seek "other arrangements satisfactory to the [PSC]" despite being urged to do so.  The PSC therefore properly rejected DIUC's belated request for a reparations surcharge.  *See SCE&G*, 275 S.C. at 491, 272 S.E.2d at 795 ("The crux of this issue is the firm principle that rate-making is prospective rather than retroactive.  The [PSC] has no . . . authority . . . to determine that the rate previously fixed and approved was unreasonably low, and that the customers would thus pay the difference to the utility.").  The decision of the PSC is

---

[10] 299 S.C. 500, 386 S.E.2d 250 (1989).

**AFFIRMED.**

**BEATTY, C.J., FEW, JAMES and HILL, JJ., concur.**