386 A.2d 1103.

## Bristol County Water Company *v.* William W. Harsch *et al.*

MAY 26, 1978.

Present: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J.   These are two public utility rate cases in which Bristol County Water Company (the company or Bristol Water) is appealing from certain actions taken by the Public Utilities Commission (the commission). The appeal relates to the company's efforts to obtain the commission's approval for a 1974 proposal and a 1976 proposal, each of which would have increased the cost of water being consumed by many residents of the Barrington-Bristol-Warren area of Rhode Island. We will first consider the commission's disposition of the 1974 proposal and then review the company's challenge to the rate of return fixed by the commission in the 1976 proposal.

Before proceeding further, we would allude briefly to the company's corporate kin. Bristol Water is, for all practical purposes, the offspring of American Water Works Company, Inc. (American). The parent, a holding company colossus whose 1975 consolidated assets were valued in excess of $851 million, controls the distribution system which sells water to millions of customers. American Water Works Service Company, Inc. is a wholly owned subsidiary of American. It provides a variety of technical services to Bristol Water and to other operating subsidiaries of American who sell water to inhabitants of over 100 municipalities situated throughout the United States. The services which are furnished to the operating subsidiaries for a fee inlcude expert help in such areas as engineering, accounting, ratemaking, and data pro-

cessing. Bristol Water is part of American's eastern division. The division consists of 16 to 18 water utility companies which are located in the states of New Jersey, New Hampshire, Connecticut, Massachusetts, and Rhode Island. The corporate officers of each of these utilities are also employees of the service company.

### The 1974 Proposal

This is the second time the company has come before us and taken issue with the commission's disposition of its 1974 effort to increase its rates. Earlier, in *Bristol County Water Co. v. Public Utilities Commission*, 117 R.I. 89, 363 A.2d 444 (1976), we remanded the case to the commission and ordered the commission to point out the evidentiary basis which would support the commission's rejection of various operating revenues and expenses which the company had included in its rate hike application. The company's proposal, which was based upon a 1973 test year, was geared to generating an additional annual increase in revenue of close to $266,000. The commission, in rejecting the company's proposal, classified the proposed increase in revenue as excessive, unjust, and unreasonable. However, the commission did authorize the company to submit a new proposal which would produce an annual increase in revenue of almost $135,000.

In our remand the commission was directed to point out to us the evidence upon which it relied to (1) increase by 2 percent the company's estimate of its annual increase in sales; (2) reject the company's proposed 7-year period for amortizing the maintenance expense of its standpipes and substitute therefor a 10-year amortization period; (3) disallow a $19,000 item which was the anticipated cost of assistance to be given by the American Water Works Service Company, Inc. in preparing the 1974 rate case and replace the $19,000 item with an allowance of $8,500; and (4) classify as unreasonable $72,691 in management fees paid by the company during the test year to the service company, and reduce the allowable amount of fees by $13,404.

In remanding the case to the commission, we made two additional comments. We first observed that the commission might have to recalculate its original allowance for cash-working capital once it had completed its reconsideration of the questioned income and expense items. Our final comment was addressed to Bristol Water's argument that the commission, in establishing the approved rate of return, could not take into consideration the quality of the product being sold to the consumer. We disagreed with the company's position and said that "quality of service" was a proper consideration in determining the amount the consumer "will have to pay for those services in the immediate future." 117 R.I. at 106, 363 A.2d at 453.

When the commission conducted its October 1974 hearing, it had listened to complaints about a product whose quality was so poor that health authorities considered issuing an order requiring the boiling of all drinking water. Since a remand was a necessity, we told the commission to check out the company's plant improvement program which, according to the record, was scheduled to be completed in May 1975. If the company had, in fact, improved its product, we suggested that a reconsideration of the approved rate of return might well be in order.

Our remand was incorporated in an opinion which was filed on August 23, 1976. At that time there was pending before the commission an application for an upward revision in rates which had been filed on February 13, 1976. That application, which was based upon a 1975 test year, contemplated an increase in the company's annual revenues of about $460,000 above the almost $135,000 increase granted by the commission in April 1975.

Upon receipt of our opinion, the commission held a series of "concurrent" public hearings in early November and December 1976 at which it considered evidence and testimony relating to the remanded issues and the merits of the company's 1976 proposal. The commission issued its decision

and order in mid-December. In addressing itself to our remand, the commission made several comments, but it did not make any changes in its original computations of the company's operating income and expenses. The failure of the commission to amend its calculations is the basis of the company's appeal regarding the 1974 remand.

While the company does not fault the commission's handling of the rate-case-expense allowance, it does contend that the commission's reconsideration of 1974's operating revenues, standpipe amortization period, management fees, and the rate of return was totally inadequate. It asks us to permit an increase in the 1976 rates which would compensate it for the alleged loss incurred because of the supposedly improper adjustments made by the commission in those four specific areas of its 1974 proposal. This we will not do.

In disposing of Bristol Water's claim that the commission did nothing to reassess its original findings, we think it appropriate to describe the positive actions taken by the commission following its receipt of our remand order. In its 1976 decision the commission adhered to the $8,500 rate-case-expense allowance originally granted when the company's 1974 proposal was first considered because, in the commission's view, "proceedings on remand showed that this allowance in fact accurately reflected rate case expenses incurred by the Company." The commission characterized the company's challenge of the allowance as a "frivolous waste of Commission and court time." The commission also defended its original choice of a 10-year amortization period for standpipe maintenance by pointing to the company's adoption in 1976 of a similar period. There are four standpipes.[1] The commission pointed to evidence adduced at the November 1976 hearing which indicated that one standpipe had not been painted in 12 years, a second had not been painted in ten, and a third had a history of hiatuses between paintings

---

[1] A standpipe is an elevated tank. The capacities of the tanks range from 2 million gallons to 250 thousand gallons.

of 8 and 9 years. The fourth structure was comparatively new and was painted once — in 1970.

The commission left the 1974 rate of return undisturbed and with good reason. The commission's final public hearing was held in Bristol on the evening of December 9, 1976. When the commission chairman inquired about the quality of the company's 1976 product, a witness testified: "There are very, very few people that dare to drink the water from Bristol County Water Works and I vouch for that. It has [sic] a lot to be desired. * * * Everybody complains, they always complain about the water, but what can you do about it? They have to accept it, they have no choice."

We believe that the commission's failure to modify its position with regard to the amortization of standpipe expenses and the rate of return is fairly and substantially supported by legal evidence. *Providence Gas Co.* v. *Burke,* 119 R.I. 487, 380 A.2d 1334 (1977); *Narragansett Electric Co.* v. *Harsch,* 117 R.I. 395, 368 A.2d 1194 (1977).

In actuality the only two remanded questions upon which the commission made no further definitive findings were its prognostication of the 2 percent increase in sales and its refusal to give the company full credit for the management fees paid to the service company. The 2 percent figure actually amounts to $23,700. The disputed management fees add up to $13,404. If the commission erred in its disposition of these two matters, its calculations in regard to the company's 1974 application would have to be revised. The approved sales figure would be reduced by $23,700, and the operating expense account would be increased by $13,404.

Everyone agrees that the commission was faced by a dilemma as a result of the overlapping of the 1974 remand and the 1976 filing. Final resolution of the 1976 rate filing had to be made by December 15, 1976. Otherwise, the company's 1976 proposal would automatically go into effect. General Laws 1956 (1977 Reenactment) §39-3-11 empowers the commission to stay the effective date of a change in rates

for a total period of 9 months beyond the proposed effective date of the new tariff.[2] The proposed effective date of the 1976 rate increase request was March 15. Thus, when our remand order was published on August 23, 1976, 5 months of the 9-month period had expired. At the time of the remand the commission had not begun the public-hearing facet of its investigation into the 1976 rate filing. However, there is evidence that during June 1976 staff members of the Division of Public Utilities (the division) were inspecting a portion of the company's records.

The consolidated approach taken by the commission once it received our remand order was agreed to by the company. The final consolidated hearing took place on December 9, 1976, just a week before the 1976 rates would take effect ipso facto. The commission's decision and order concerning its consideration of the remand and the 1976 rate proposal was published on the final day of the suspension period, to wit, December 15, 1976.

Whatever the ultimate effect these calculations would have had on the approved 1974 rates, its duration would have been extremely limited because, unless the commission had decided the 1976 rate hike case before December 15, 1976, the pending 1976 proposed rates would have become effective as of December 16. Assuming an upward revision of the approved 1974 rate was in order, the most the company could have expected was a 1-week slice (from December 9, when the public hearings were concluded, to December 16, when the 1976 rates became effective) of the income that would have been produced but for the commission's supposed miscalculation of the company's operating revenue and management fees.

---

[2]Beginning in mid-1978, the commission's suspension power will be reduced. At its January 1977 session, the General Assembly amended G.L. 1956 (1977 Reenactment) §39-3-11 so that as of July 1, 1978 the commission will be able to suspend the proposed effective date of a new tariff for a period of 8 months rather than 9. P.L. 1977, ch. 236, §2.

Furthermore, if the test-year figures for the 1974 rate filing were recast to compensate for the supposedly improper adjustments, the commission would also have had to go back over the entire revenue and expense figures involved in the 1976 proposal. Since adjustments in the 1974 rate proposal would have been reflected in the test-year figures of the 1976 case, any increase in test-year revenues brought about by adjustments in the 1974 proceeding would have called for a reduction in the 1976 revenue deficiency determination. Such a re-examination of the 1976 proposal would have been virtually impossible if the commission was to meet its December 15 deadline for passing upon the 1976 rate hike application.

When the necessary mathematics is done, the actual loss to the company could be described in classical Latin as "de minimus" or in the language of the everyday business world as "nickels and dimes." Whatever the amount, it would hardly pay the cost of the service company's cranking up its computers to include this pittance within all its bills. There is also a question of whether this 1-week prospective increase could properly find its way into the existing billing structure since most company customers are billed in arrears on a quarterly basis. One group's first payment is due in January, another's first bill is received in February, and the third group receives its bill in March.

Given the fact that the chain of events prevented the issuance of a supplemental order in the 1974 filing, we must now decide whether the commission should have taken some other action which would constitute an adequate response to our remand. The commission recognized the problem which confronted it and made a concession to the company in the form of accepting without modification, or apparent questioning, the company's estimate of its revenues and management fees for the test year in the 1976 case. The company insists that the commission should have recalculated the revenue requirements in the 1974 case, making proper adjustments in

the categories to which we have previously referred, and then added any deficiency to the amount deemed collectible under the 1976 application.

In this facet of their argument, Bristol Water is calling for the setting of rates based partially upon past losses. This falls clearly within the general proscription against retroactive rate-making. We have stated on numerous occasions that a fundamental principle in ratemaking is that rates are exclusively prospective in nature. Further, rates may not be designed to recoup past losses. *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 358 A.2d 1 (1976); *Rhode Island Consumers' Council v. Smith,* 111 R.I. 271, 302 A.2d 757 (1973). The rule prohibiting the imposition of retroactive rates holds true despite the fact that the company's loss might be attributable to the inevitable result of a regulatory lag. We are mindful that there is an exception to the proscription against retroactive ratemaking because in *New England Telephone & Telegraph Co.* we stated:

> "[A] rate schedule which represents a deprivation of due process either in its inability to provide a fair return or in the grossly excessive time it took to correct good faith errors of the commission in arriving at the new rates would certainly entitle the company to some sort of extraordinary relief." 116 R.I. at 392, 358 A.2d at 22.

Nevertheless, we do not believe the exception can be made applicable to the facts surrounding the 1974 remand.

We cannot fault the commission for the manner in which it responded to our remand. We are acutely conscious of the prodigious increase in rate-case litigation and its impact on the commission as it strives to discharge its statutory duty within a limited period of time. Given the timing of the remand, the pendency of the 1976 proposal, the acquiescence of the company to the consolidated approach taken in the fall of 1976, and the time bind in which the commission found

itself,[3] the approach it took in dealing with an almost impossible situation was fair and reasonable.

### 1976 Rate of Return

There is no need to cite chapter and verse as we make a brief reference to the well-settled legal principles which are applicable to this facet of the company's appeal. Suffice it to say that the rate of return is the percentage by which a utility's rate base is multiplied, providing a figure that will allow a utility to pay its operating expenses and attract investment. In setting the rate, the commission is obligated to fashion a rate of return that is comparable to that allowed other enterprises engaged in similar activities with similar risks in the same general area. In other words, the commission must establish the rate of return at a level which should attract new capital investment, adequately compensate the present investors, and protect the public interest.

In seeking to attain these three goals, the commission is not bound to follow any particular formula so long as the rate it fixes is fair and reasonable. The rate of return approved by the commission carries with it a presumption of reasonableness which remains until such time as the contrary is proved.

The 1976 rate-of-return facet of this controversy became the battle of the experts. Both experts have appeared numerous times before a variety of public utility regulatory agencies.

Homer A. Severne, the company's expert, is a retired senior vice president of one of the nation's largest insurance companies. His corporate responsibilities included the supervision of the insurer's $4.5 billion investment portfolio. He told the commission that it was absolutely imperative that

---

[3]Concrete evidence of this constraint can be found in an affidavit submitted to the commission by the company. It was executed by the company's general manager and offered as a rebuttal to consumer complaints made at the December 9, 1976 public hearing. The manager stated that the "objection to occasional chlorine odors is valid, but the use of chlorine is absolutely necessary in the treatment of the water." The affidavit was received by the commission on December 14, 1976, the day before the expiration of the statutory 9-month suspension period.

Bristol Water be allowed to realize a 10.25 percent return. The commission in its December 15, 1976 decision rejected his testimony and set the rate of return at 7.25 percent, a figure which would increase the company's annual revenues by just over $210,000. In reaching this conclusion, the commission relied upon the testimony of the division's expert, an economist, Dr. John W. Wilson.

There was little disagreement between the experts regarding the company's debt-equity ratio (capital structure) or the return rate required to compensate for embedded costs (long-term debt). The experts testified that as of September 30, 1975, the last day of the test year, the company's total capitalization was comprised of 59.68 percent long-term debt and 40.32 percent of common stock. Each witness placed the company's total debt capital at $2,835,000. The company's expert believed that the cost of this debt financing was 5.26 percent, while Dr. Wilson was of the opinion that this cost amounted to 5.165 percent.

The experts parted company when it came to determining the cost of the company's common equity. Mr. Severne had estimated the cost of equity at 16 percent, while Dr. Wilson recommended an equity allowance of 12 percent. Since the commission, in setting the approved rate of return, actually relied on Dr. Wilson's estimate of the cost of common equity, there is no need to discuss in detail the testimony of Mr. Severne.

The economist's testimony is replete with terms such as "leveraging," "interface," and "integrated entity." He told the commission that a proper consideration of the rate of return demanded an in-depth evaluation of Bristol Water's position within the corporate structure of American. In making this remark, Dr. Wilson made specific reference to another of Bristol Water's corporate cousins, Greenwich Water System, Inc. (Greenwich). Greenwich, which is a wholly owned subsidiary of American, owns 86.8 percent of the company's common stock. This stock is Greenwich's sole

asset. The remaining stock is owned by the town of Bristol. Greenwich finances its 86.8 percent ownership with capital having a composition of 45.24 percent long-term debt and 54.76 percent common stock. All of Greenwich's common stock is owned by American, which in turn finances its investment in Greenwich with capital consisting of 40.32 percent long-term debt and preferred stock and a 59.68 percent component of common stock.

In his testimony Dr. Wilson reminded the commission to view American and its subsidiaries as an "integrated entity." He observed that unless the commission was particularly vigilant, American's corporate network could well "mask the economic realities of the situation." In establishing the cost of equity, the economist said the critical factor lay where the "interface" existed between the corporate entity and the capital market. The division's expert said that the interface, or the investment decision, comes at the point where American sells its common stock to the public. He emphasized that in setting the cost of water for Bristol Water's consumers the commission should examine the rate of return being realized by the investor who purchases American's common stock. The witness' concern that the commission scrutinize American's corporate relationships while directing its attention to the point of investment decision arises from the fact that the record discloses the use of a device known to the prudent money manager as "leveraging." In financial parlance "leveraging" involves the use of capital[4] which has a fixed cost in the hope of earning a higher return than that cost. Dougall, *Investments* 107 (8th ed. 1968). As will be seen, it is this type of capital which furnishes the leverage. The capital has a fixed claim on the assets and earnings so that if there is an increase in the value of the assets and earnings, the increases redound to the benefit of the owners of the common stock.

---

[4]Capital, having a fixed cost is raised by the issuance of bonds, debentures, notes, mortgages, or preferred stock which has a fixed yield.

Assuming a business has total assets of $10 million and a capitalization of $5 million of par value bonds and 500,000 shares of common stock, the asset value of each share of stock is $10. If the value of the total assets increases 50 percent to $15 million, the equity of the stock increases to $10 million or $20 a share, a 100 percent increase in value. The significance of the use of leveraging in a holding company setting and how it relates to the establishment of Bristol Water's 1976 rate of return will become apparent once we look at American's integrated structure one entity at a time.

To illustrate the phenomenon of leveraging, Dr. Wilson provided an analysis which we have modified and cast in a narrative setting with the hope that those who are not conversant with the intricacies of capital management may gain some insight into the financial ramifications of the Bristol-Greenwich-American family tree. The analysis begins by assuming a return of 8 percent to Bristol Water on its total capitalization. This will yield on every $1,000 of capital a return of $80. The company finances every $1,000 of capital with 59.68 percent debt and 40.32 percent equity. Consequently, for every $1,000 of capital in Bristol, $596.80 represents the debt investment ($1,000 x 59.68 percentage of debt) and $403.20 ($1,000 x 40.32 percentage of equity) represents the common equity investment.

Since we are employing 8 percent as the return on capital, Bristol Water receives $80 for every $1,000 of investment. From the $80 return, the company must pay its debt service. We multiply $596.80 (the amount of debt per $1,000 capital) by .05165 (the cost of debt). This yields a figure of $30.82 out of the $80 which is earmarked for the payment of debt service. The remaining sum of $49.18 is available for distribution to the holders of Bristol Water's common stock.

Dr. Wilson then made an allowance for the 13.2 percent of common stock which is owned by the Town of Bristol. He first assumed that the town should receive a 12 percent return on its stock. He determined the town's share of the

$49.18 due the stockholders by taking $403.20 (the total equity investment per $1,000 of capital) and multiplying it by the stock percentage owned by the town (.132). The result is $53.22, which is then multiplied by 12 percent (the assumed return) to yield a figure of $6.39. Consequently, for every $1,000 of capital, $53.22 represents town ownership, for which it receives a dividend of $6.39. The remainder of $42.79 is then available as a dividend to be paid to Greenwich.

The economist then determined that Greenwich's contribution to Bristol Water's common equity amounted to $349.98 ($403.20 − $53.22, the town's share). Greenwich finances this $349.98 contribution with 45.24 percent debt and 54.76 percent equity. Therefore, of this $349.98, $158.33 was supplied by long-term debt ($349.98 x .4524 − percentage of debt financing). The cost of the $158.33 of debt to Greenwich was .06756. The amount of the return flowing from the company to Greenwich ($42.79) is then reduced by $10.70 ($158.33 x .06756). This leaves a sum of $32.09, which is payable to American as a dividend on its 100 percent common stock ownership in Greenwich.

Dr. Wilson pointed out that if one looks at the return to Greenwich on its common stock, the true effect of leveraging can be seen. Greenwich financed a part of its investment in Bristol Water with long-term debt. Only $191.65 of its $349.98 contribution was financed by common equity. Thus, a return of $32.09 on total equity investment of $191.65 is 16.7 percent. By using long-term debt to finance a large part of its investment in Bristol Water, Greenwich has leveraged its equity investment and created a greater return for its sole stockholder.

The next level in the chain of intercorporate relations is the parent company, American. American finances its 100 percent ownership of Greenwich's stock with 21.69 percent debt, 18.63 percent preferred stock, and 59.68 percent equity. Therefore, the financing of Greenwich's $191.65 of

common equity by American can be broken down as follows:

1. $41.57 for debt ($191.65 x .2169);
2. $35.70 for preferred stock ($191.65 x .1863).
3. $114.38 of common stock ($191.65 x .5968).

The amount which American has to deduct from its $32.09 dividend from Greenwich because of debt and preferred stock costs is $4.05. This is determined by taking the cost of each of these items of capital and multiplying them by the corresponding sum used to finance Greenwich's equity. The cost of debt to American is .058 and is multiplied by $41.57 to arrive at a figure of $2.41. The cost of the preferred stock is .0459 and is multiplied by $35.70 for a total of $1.64. Thus, from its return of $32.09 from Greenwich, after deducting the cost of debt and preferred stock, American has $28.04 available to pay dividends.

Because of the pyramiding corporate structure, for every $1,000 of capital in the company, the public investors have contributed to American a total of $114.38. The investors receive $28.04 on their investment for a return of 24.5 percent. Dr. Wilson testified that a 24.5 percent return to American's stockholder was the ultimate result of the leveraging phenomenon. To compensate for the effect of leveraging, he proposed an over-all rate of return to Bristol Water of 7.25 percent. This would result in a return of over 12 percent to the holders of American's common stock. Even with anticipated bond and common stock issuances, this expert testified that the return to American would exceed 12 percent based upon a 7.25 percent rate of return to the company.

Bristol Water objects to the commission's centering its attention on the cost of equity to American rather than relying upon the cost of equity to itself. The operating subsidiary maintains that the commission erred in not considering the fact that it finances its own debt. To support its objection, the company refers us to *Lower Paxton Township* v. *Commonwealth*, 13 Pa. Commw. Ct. 135, 317 A.2d 917

(1974). This case provides little support for the position taken by the company. The Pennsylvania court acknowledged that when a public utility is a wholly owned subsidiary, its capital structure may not be comparable to another public utility which is obliged to obtain its equity and debt financing in the open market. In such instances the court acknowledged that it had approved actions of the public utilities commission when it considered the parent company's capital structure and the cost of capital in determining the same for the subsidiary. The commission, in the *Lower Paxton Township* case, was dealing with a rate request of a water company whose capital structure was composed entirely of equity capital which was totally owned by a holding company which, in turn, was wholly owned by its parent, another holding company. The commission looked at the capital structure of the holding company and formulated a capital structure for the operating subsidiary composed of 55 percent debt and 45 percent equity. However, the commission refused to go up to the third tier and look at the capital structure of the parent company because it supplied no financing whatever to the operating subsidiary and operations were more varied than a company restricted to public utility water service. The Pennsylvania court stated that the actions taken by the commission represented "a judgment figure * * * which should not be disturbed except for a manifest abuse of discretion" and the court could find no such abuse. 13 Pa. Commw. Ct. at 143, 317 A.2d at 922.

Dr. Wilson's presentation was based on a complex theory known as "double leveraging." This formula was employed to some extent by the regulatory agency in *United Telephone Co. v. Iowa State Commerce Commission*, 257 N.W.2d 466 (Iowa 1977). In approving application of the theory to the facts, the Iowa Supreme Court could find no evidence that the agency had acted in an aribitrary or capricious manner.[5]

---

[5]The New York Public Service Commission has also compensated for the effect of leveraging in a multi-tiered corporate structure. *Re General Tel. Co.*, 90 PUR 3d 30 (1971). However, the Michigan Public Service Commission has refused to apply the

In considering this facet of the company's appeal, our task is not to choose between one or more permissible conflicting alternatives. The commission has been entrusted with this difficult duty. We will not interfere with the rate of return established by the commission unless we are satisfied by clear and convincing evidence that the rate is clearly, palpably, and grossly unreasonable. *New England Telephone & Telegraph Co.* v. *Public Utilities Commission,* 118 R.I. 570, 376 A.2d 1041 (1977). The company has failed to present such evidence. In fact, the record would indicate that the commission, in discharging its duties, took into consideration the interest of the utility and of the public as well.

Accordingly, we cannot sustain the company's contention on either the commission's response to the 1974 remanded issues or the rate of return in the 1976 filing. Therefore, we remit the records in these proceedings to the commission with our decision endorsed thereon.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

*Coffey, McGovern, Noel and Novogroski, John G. Coffey, Jr.,* for petitioner.

*Julius C. Michaelson,* Attorney General, *R. Daniel Prentiss,* Special Assistant Attorney General, for respondent.

---

concept of leveraging in cases where it could not trace to the source the funds which the parent company used to finance the subsidiary's common stock. *Re Michigan Bell Tel. Co.,* 85 PUR 3d 467 (1970).