June 14, 2024

**Supreme Court**

No. 2022-167-Appeal.
(PC 17-4623)

North Farm Home Owners      :
     Association, Inc.

v.            :

Bristol County Water Authority.    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

North Farm Home Owners      :
    Association, Inc.

v.             :

Bristol County Water Authority.   :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.**  The plaintiff, North Farm Home Owners Association, Inc. (North Farm), appeals from a judgment of the Superior Court entering partial summary judgment on counts three and four of its third amended complaint in favor of the defendant, the Bristol County Water Authority (the BCWA).  North Farm argues that the hearing justice erred because: the parties formed a valid contract by means of their 1993–1995 correspondence; the hearing justice ignored the allegations in count four that the 2019 pass-through rate was illegal; and the hearing justice denied North Farm's motion to amend without a finding of prejudice.  This appeal first came before the Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After hearing the arguments of counsel and

- 1 -

examining the memoranda filed by the parties, we concluded that cause had been shown, and we assigned this case to the regular calendar for further briefing and argument. We specifically ordered the parties to brief the issues pertaining to count four of North Farm's third amended complaint, including without limitation the remedies sought pursuant to count four. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## Facts and Travel

The relevant facts in this matter are undisputed. The North Farm Condominium Complex is a multi-building condominium complex located in Bristol, Rhode Island, consisting of over fifty buildings with several units per building. The complex was developed in several different phases between 1973 and 1989. During development, several easements were granted to the BCWA, a public utility bearing the obligation to provide water to residential and commercial customers in Bristol County. The purpose of the easements was "to construct on, lay in, repair on, patrol, maintain, relay and replace water pipelines * * * for use in connection with the transmission and distribution of water, in, along, over, and under those certain strips of land situated within the easement lines * * *." The easements were granted "in perpetuity," and the BCWA's pipelines were to remain the personal property of the BCWA.

From approximately 1975 to 1995, the BCWA measured water service to each condominium unit individually by means of meters located in pits next to each building in the complex. Every condominium unit owner was charged a flat service charge and a commodity charge. The service charge was designed to recover fixed expenses incurred by the BCWA, and the commodity charge was the cost of the water actually consumed. By contrast, under a master meter system, the property owner, rather than each unit owner, is charged using a single master meter to measure water consumption. The master meter system can result in substantial savings because there is only one service charge that is divided among the unit owners. Accordingly, from 1993 to 1995, representatives of the parties exchanged a series of letters in which they discussed converting the individual meter system to a centralized, master meter system. This correspondence—and whether it constitutes a valid contract—is at the heart of this dispute.

The 1993–1995 correspondence began on July 13, 1993, when the BCWA sent a letter to North Farm (the July 1993 letter).[1] The July 1993 letter informed North Farm that a number of its water meter vaults could be classified as "Permit Required Confined Space[s]" under the new Occupational Safety and Health Administration (OSHA) confined-space regulations. Pursuant to the new OSHA

---

[1] The 1993–1995 correspondence was carried out by representatives of the parties. For ease of reference, we will refer to their correspondence as if it were being sent and received by North Farm and the BCWA.

regulations, permits were required to enter "Permit Required Confined Spaces," and these spaces were subject to several new restrictions: Warning signs were required to be posted at access points; an attendant was required to stand watch to monitor for hazards; and the entrants and attendants were required to be trained on the space's hazards. Accordingly, the BCWA informed North Farm that "as [the] owners of the [water meter] vaults, [it] has considerable responsibility under this law." It noted that there was previously a plan to convert to a master meter system and that "[t]here [was] a[n] economic advantage to such a plan through reduced service charges and a possible lower average water cost." The BCWA thus requested that North Farm call to discuss a master meter system.

On August 27, 1993, the BCWA sent a follow-up letter (the August 1993 letter) containing information on North Farm's water usage. On the enclosed sheet, the BCWA articulated the difference in water costs that North Farm incurred the previous year using individual meters versus what its water costs would be if it had converted to a single master meter. The BCWA indicated that there would have been $33,845.37 in savings. There was no further written correspondence until April 29, 1994, when North Farm sent a letter (the April 1994 letter) requesting documentation. North Farm acknowledged that it had been considering the possibility of a master meter system but noted that it had become "apparent * * * that formal documentation from the BCWA is required concerning the future

responsibility for water main maintenance, as well as for the handling and status of the existing 280 some-odd water meters on the property should we opt for central metering." North Farm thus asked the BCWA to develop and forward the requested information.

On May 11, 1994, the BCWA responded by letter (the May 1994 letter) that its "position as to maintenance of water mains at North Farm if a new master meter is installed would be to continue the present maintenance repair and/or replacement of water mains within the easement granted to [the] BCWA when North Farm was built." The BCWA noted that all water pipes within the easement would be maintained by the BCWA but that all piping outside of the easement would be maintained by North Farm. Lastly, the BCWA asserted that it would "abandon or contribute to" North Farm any remaining meters then installed at North Farm, but that "[a]ll costs associated with the installation of the master meter would be borne by [North Farm]."

On March 31, 1994, North Farm sent a letter (the March 1994 letter) to John Pagliarini, Tax Assessor for the Town of Bristol, notifying him of the project within North Farm concerning "the possible development of a centralized water metering system * * *." On June 6, 1994, the BCWA sent another letter to North Farm (the June 1994 letter) containing an updated water analysis. The enclosed documents contained a handwritten calculation of the potential savings of converting to a master

meter system. However, there was no further correspondence until February of the following year.

On February 22, 1995, the BCWA sent North Farm a letter (the February 1995 letter) noting that the parties had been "discussing [North Farm's] plans for solving the problems relating to the existing North Farm meter vaults for more than a year without yet arriving at a solution[,]" and that North Farm had "indicated that [it would] propose to install a ventilated master-meter vault, located near the guard house on the main entry road." The BCWA requested that North Farm "promptly finalize [its] plans and present [its] detailed proposal to us[,]" because the present situation was dangerous to the BCWA's employees.

On April 28, 1995, North Farm sent a letter to the BCWA advising that "the North Farm Board of Governors has unanimously approved moving forward with the plan to install a Centralized Water Metering System, and the establishment of a single billing arrangement for the residential water service and consumption." It further stated that there were certain "specific and agreed upon arrangements" that were "[e]ssential to this conversion plan." These arrangements were enumerated as follows: The individual meters would be abandoned in place and returned to the BCWA should maintenance require their removal; the water main facilities within North Farm would "continue to be owned and maintained by the BCWA"; North Farm would be responsible for the fire hydrants and fire service charges; the

installation of the master meter would be "in accordance with BCWA standards and specifications and final approval"; master meter service would be metered "through a single 6" meter [and] * * * [b]illing would be based on the single 6" metered service"; the BCWA would assist North Farm in transitioning its residents' billing services; and North Farm would "reimburse [the] BCWA for the costs associated with programming and special mailings."

A letter dated May 31, 1995 (the May 1995 letter), and a draft letter dated "May , 1995" (the May 1995 draft letter) were written by North Farm and subsequently distributed to the BCWA. The letters were addressed to the North Farm "Residents and Homeowners[,]" notifying them that the planning phase of the master meter project was over and informing them of the new billing system. The letters stated that the new master meter system would produce "savings of over $30,000 in every year from the conversion point forward." Subsequently, the BCWA received the master meter pit drawings, North Farm paid approximately $75,000 for the installation of a master meter system, and the BCWA began billing North Farm through a master meter.

This arrangement continued without issue until 2014, when a water pipe broke at North Farm and a dispute arose over the responsibility for its repair. At the time the BCWA was unaware of the original easements and believed that it was not responsible for fixing the break because the property owners in a master meter

system are typically responsible for maintaining the water pipes downstream of the master meter. North Farm informed the BCWA that it owned the water mains and water systems in accordance with the easements in early 2016. The BCWA subsequently informed North Farm that either the parties could agree to transfer title of the water systems back to North Farm, or the BCWA would have to revert to an individual meter system in order to recover the costs associated with maintaining and repairing the pipes.

On September 28, 2017, North Farm initiated this action by filing a four-count complaint against the BCWA alleging that North Farm and the BCWA had formed a contract "[i]n or about 1994" to install a single, central meter system and that the BCWA breached this 1994 agreement by stating its intent to terminate the central metering system and by rejecting its responsibility for repairing the water main breaks. Count one sought damages for the BCWA's breach of its obligation to repair the water pipes it owned under the easement; count two sought restitution damages for the cost of repairs to the water pipes in the easement; count three sought injunctive relief for the BCWA's unilateral termination of the central metering system that was established and installed by mutual agreement in 1994; and count four sought, in the alternative, compensatory damages for the BCWA's repudiation and anticipatory material breach of the 1994 agreement. Subsequently, North Farm sought and obtained preliminary injunctive relief "restrain[ing] and enjoin[ing] [the

BCWA] from terminating the central water metering system at North Farm[,]" and North Farm filed its first amended complaint, which consolidated counts three and four into a single count: count three. In response, the BCWA asserted several counterclaims relating to North Farm's purported encroachment onto its easements.

One and a half years after North Farm filed suit, the BCWA board of directors unanimously adopted new rates effective March 1, 2019. One new rate, referred to as the "2019 pass-through rate," was intended to address situations, like its arrangement with North Farm, in which the customer used a master meter, but the BCWA maintained responsibility for the maintenance of the customer's pipes. The new rate provided that:

> "For any meter that measures water that passes through the meter and is delivered to more than one premise, and where the BCWA maintains the distribution pipes downstream of that meter, the BCWA will charge the customer a Customer Service Charge equal to the number of premises that receive water multiplied by the customer service charge for a 5/8″ x 3/4″ meter."

On April 29, 2019, the BCWA informed North Farm that it had adopted the 2019 pass-through rate. The letter requested that North Farm confirm the number of units served by the master meter "[s]ince this new fee will apply to North Farm * * *." On April 16, 2019, North Farm was billed $40,008.37, including a service charge of $24,858, based on the new rate. The 2019 pass-through rate has never been applied to any BCWA customer other than North Farm.

On August 5, 2019, North Farm filed its second amended complaint to add an additional count, count four, seeking remedies based upon the new service charge. Count four asserted a claim "for remedies against [the] BCWA sextupling the service charge for North Farm to 300 service charges for 300 units at North Farm, which do not have meters and are not customers of [the] BCWA, in breach of the 1995 contract for a single master meter."[2] More specifically, count four seeks injunctive relief prohibiting the BCWA from terminating the metering system based on North Farm's nonpayment of the excess service charge, which North Farm alleges violates the 1995 master meter contract, is "discriminatory and unlawful[,]" and violates the court's preliminary injunction order. Count four further seeks compensatory damages, and a declaratory judgment, declaring that "the 1995 agreement between North Farm and [the] BCWA for a master water meter is enforceable as a contract * * *."[3]

On February 5, 2021, North Farm filed a motion for leave to amend its complaint to add an additional count. The hearing justice denied the motion for

[2] After North Farm filed its second amended complaint, it also filed several third-party claims for indemnification and contribution against numerous construction, insurance, and utility companies as well as the Town of Bristol. This sparked a flurry of cross-claims. However, counts three and four were severed from all other claims, counterclaims, cross-claims, and third-party claims in this action. Therefore, there are several remaining claims between the parties that are not the subject of the instant appeal.

[3] Count four additionally sought several more declarations concerning the terms of the purported contract.

- 10 -

leave to amend without prejudice, reasoning that it was in his discretion to do so and that denying the motion would allow the case to move forward. Subsequently, the BCWA filed a motion for summary judgment on counts three and four of North Farm's second amended complaint. On September 14, 2021, North Farm filed its third amended complaint, deleting two of the original four water main breaks from counts one and two. Nevertheless, counts three and four in both amended complaints are identical; therefore, the hearing justice proceeded to hear the BCWA's motion for summary judgment as if it were addressed to North Farm's third amended complaint.

The hearing justice granted the BCWA's motion in a written decision, concluding that the BCWA was entitled to summary judgment on counts three and four because neither the BCWA nor North Farm ever made an offer containing the material terms of the purported contract. The hearing justice reviewed the various letters between the BCWA and North Farm and found that none of the letters contained language indicating that they were offers but, instead, contained language indicating that the letters were preliminary negotiations. The hearing justice further determined that the omission of the purported material terms—namely that the BCWA was prohibited from reinstalling individual meters at North Farm and from changing the master meter service charge—also indicated a willingness to negotiate, but not to make an offer to enter into a binding contract. Even assuming that there

was an offer, the hearing justice concluded that there was no evidence of acceptance because the BCWA's mere silence was not enough to show acceptance in an overt, objective manner. Because there was no offer, the hearing justice concluded, no contract existed between the parties and, thus, summary judgment could enter on counts three and four of North Farm's third amended complaint.

After the hearing justice granted its motion for summary judgment, the BCWA filed a motion for entry of partial final judgment on counts three and four pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure. Finding that there was no just reason for delay, the hearing justice entered final judgment on counts three and four of North Farm's third amended complaint. Thereafter, North Farm filed a timely notice of appeal.

**Standard of Review**

"This Court reviews a decision granting a party's motion for summary judgment *de novo*." *Nissensohn v. CharterCARE Home Health Services*, 306 A.3d 1026, 1033 (R.I. 2024) (quoting *Citizens Bank, N.A. v. Palermo*, 247 A.3d 131, 133 (R.I. 2021)). "We assess the matter 'from the vantage point of the trial justice, viewing the evidence in the light most favorable to the nonmoving party, and if we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law, we will affirm.'" *Id.* (brackets and deletions omitted) (quoting *Citizens Bank, N.A.*, 247 A.3d at 133). "Although

- 12 -

summary judgment is recognized as an extreme remedy, to avoid summary judgment the burden is on the nonmoving party to produce competent evidence that proves the existence of a disputed issue of material fact." *Id.* (deletion omitted) (quoting *Citizens Bank, N.A.*, 247 A.3d at 133).

## Discussion

### Count Three

North Farm argues that the hearing justice erred in granting summary judgment on count three of its third amended complaint because it provided sufficient evidence to prove the "prima facie" elements of a contract. North Farm argues that it entered into a "master meter contract" with the BCWA through a series of correspondence between 1993 and 1995. North Farm submits that the July 1993, August 1993, March 1994, May 1994, June 1994, and February 1995 letters were offers. In particular, North Farm states that the August 1993 letter "was an offer that, if North Farm were willing to incur the costs of converting to a single master meter, North Farm would realize savings of tens of thousands of dollars per year on water bills," due to "paying just a single service charge for a 6-inch master meter[,] rather than 280+ service charges for 5/8-inch residential meters for individual units." As such, North Farm maintains that it manifested its acceptance to these offers by its April 1995 letter. If, however, its April 1995 letter is considered a counteroffer,

- 13 -

then North Farm asserts that the BCWA accepted its counteroffer by "inaction * * * which manifested acceptance[,]" and by performing the master meter contract.[4]

In response, the BCWA argues that this Court need not look further than the collection of letters that North Farm alleges are offers to determine that no contract was formed. The BCWA asserts that the letters do not show the parties' mutual

---

[4] Although North Farm conceded that the material facts are undisputed and that there are sufficient facts in the record to support its claim for breach of contract, North Farm appears to argue in the alternative that the formation of a contract is an issue of fact to be decided by the factfinder and that the hearing justice improperly granted summary judgment when there were disputed factual issues. However, North Farm fails to cite to any controlling authority that supports this argument, citing instead to *Smith v. Boyd*, 553 A.2d 131 (R.I. 1989), in which we held that the party alleging the existence of an oral contract, when the parties understood a written instrument would be executed, will bear the burden of proving an objective intent to be bound before the execution of the written contract, and *Filippi v. Filippi*, 818 A.2d 608 (R.I. 2003), in which we held that the trial justice erred in denying a motion for a judgment as a matter of law because plaintiffs failed to present clear and convincing evidence of an oral contract for testamentary disposition. *Smith*, 553 A.2d at 134; *Filippi*, 818 A.2d at 625. At oral argument, North Farm made a last-ditch effort to persuade the Court of its argument contending that the *Filippi* decision departed from this Court's pre-*Filippi* precedent which purportedly held that the existence of a contract was a matter of fact. Given that North Farm has failed to identify this purported precedent, we decline to depart from our long line of cases holding that the existence of a contract is a question of law. *See, e.g.*, *Ballard v. SVF Foundation*, 181 A.3d 27, 37 (R.I. 2018) (rejecting plaintiffs' argument that summary judgment was inappropriate on the issue of whether a contract existed because the "existence of a contract, of course, is a matter of law"); *Lerner v. Ursillo*, 765 A.2d 1212, 1218 (R.I. 2001) (holding that plaintiffs' breach-of-contract claim could not survive summary judgment because "[t]his argument might have ostensible merit if the determination of the existence of the oral agreement was a question of fact; however, its determination was a question of law for the trial justice"). We stress North Farm's obligation under Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure to fully develop its arguments on appeal. *See Terzian v. Lombardi*, 180 A.3d 555, 557-58 (R.I. 2018).

- 14 -

assent to the material contract terms by means of offer and acceptance because even assuming the letters were offers, North Farm has submitted no evidence displaying the BCWA's acceptance of the purported perpetual duration of the contract.

"[T]he determination of whether a contract exists is a question of law that this Court reviews *de novo*." *Coccoli v. Town of Scituate Town Council*, 184 A.3d 1113, 1118 (R.I. 2018) (quoting *Nonnenmacher v. City of Warwick*, 722 A.2d 1199, 1202 (R.I. 1999)). "[W]e employ traditional contract theory to 'determine the existence of an enforceable contract.'" *Andoscia v. Town of North Smithfield*, 159 A.3d 79, 82 (R.I. 2017) (brackets omitted) (quoting *Haviland v. Simmons*, 45 A.3d 1246, 1257 (R.I. 2012)). "Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed." *Smith v. Boyd*, 553 A.2d 131, 133 (R.I. 1989). Therefore, to form a valid contract, "[e]ach party must have and manifest an objective intent to be bound by the agreement." *Opella v. Opella*, 896 A.2d 714, 720 (R.I. 2006). When negotiating a contract "the parties may express their assent piecemeal, agreeing upon individual terms as the negotiation proceeds. These expressions are merely tentative and are inoperative in themselves; there is no contract until the parties close their negotiation and express assent to *all* the terms of the transaction together." 1 *Corbin on Contracts* § 2.10 at 213 (2018) (emphasis added).

Although the 1993–1995 correspondence demonstrates that there was an understanding between the parties that North Farm would convert to a master meter system, this understanding is not sufficient to create a binding contract for the *permanent* conversion from an individual meter system to a master meter system. *See Cote v. Aiello*, 148 A.3d 537, 545-46 (R.I. 2016) (holding that parties' mutual understanding was insufficient to create a contract where there was no mutual assent on essential terms). Importantly, North Farm's breach-of-contract claim is not premised upon the BCWA's failure to convert to a master meter system in the 1990s. Instead, North Farm is alleging that the BCWA breached a purported contractual obligation to *maintain* the master meter system at the North Farm Condominium Complex *in perpetuity*.

The 1993–1995 letters are devoid of language to indicate that either party intended the master meter conversion to be permanent. Even the April 28, 1995 letter—which contains the most detail regarding the plan to convert the metering system—is utterly silent on the issue of duration. The letter clarifies that the central meter would be installed in accordance with the BCWA's standards and subject to the BCWA approval and that centralized service would be metered through a single 6″ meter, but nowhere does the letter state that the master meter system would be permanent. Accordingly, neither party manifested its assent to the material terms of the transaction—i.e. that the BCWA's obligation to maintain the master meter

- 16 -

system would continue in perpetuity and that the BCWA would require North Farm's consent to return to an individual meter system. "To form a valid contract, there must be 'competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.'" *Fogarty v. Palumbo*, 163 A.3d 526, 538 (R.I. 2017) (quoting *Rhode Island Five v. Medical Associates of Bristol County, Inc.*, 668 A.2d 1250, 1253 (R.I. 1996)). Therefore, these letters do not establish the existence of a contract as matter of law. *See id.* at 539 (holding there was no contract as a matter of law when writings demonstrated that parties had not yet reached agreement on material terms).

North Farm nevertheless contends that the parties' assent to the perpetual duration of the master meter contract can be found in the May 1995 draft letter and the May 1995 letter, which were in the BCWA's possession, but were addressed to the residents of North Farm.[5] It asserts that, because these letters state that the master meter plan "produces savings of over $30,000 in every year from the conversion point forward[,]" the BCWA agreed to maintain the master meter system every year from the conversion point forward. North Farm asserts that the BCWA expressed

_____

[5] North Farm submitted no evidence regarding when or how the letter came to be in the BCWA's possession. However, viewing the facts in the light most favorable to North Farm, in accordance with the appropriate standard on a motion for summary judgment, *see Nissensohn v. CharterCARE Home Health Services*, 306 A.3d 1026, 1033 (R.I. 2024), the hearing justice assumed for the sake of the motion that the BCWA was in receipt of the May 1995 letter and the May 1995 draft letter.

its assent to this term by failing to object to it and by "fully perform[ing] the master meter contract for the ensuing twenty-two years, without dispute."

In general, silence does not constitute acceptance unless the course of dealings between the parties makes it reasonable for the offeror to construe silence as acceptance. *See Kenney Manufacturing Co. v. Starkweather & Shepley, Inc.*, 643 A.2d 203, 208 (R.I. 1994). North Farm has offered no explanation as to how the parties' prior dealings established a pattern whereby the BCWA's silence with respect to two letters—addressed to the *residents of North Farm*—should be reasonably construed as acceptance. *See id.* at 209. Therefore, the BCWA's failure to object to the May 1995 letters does not show its assent. Moreover, although the BCWA received North Farm's plans for conversion to a master meter and aided in the billing transition, these actions do not display its assent to permanently maintain the master meter system "from the conversion point forward." These actions simply reflect the understanding between the parties that North Farm would convert to a master meter system. Accordingly, North Farm failed to produce sufficient evidence that a valid contract for the material terms existed, and the hearing justice's grant of summary judgment on count three of the third amended complaint was proper. Given that there was no valid contract, we need not address the parties' remaining arguments regarding the statute of frauds and the authority of the BCWA's representatives to enter a contract.

- 18 -

North Farm alternatively asserts that a contract arose because the relationship between a public utility and its customers is contractual in nature, not terminable at will, and lasts "for the duration of the customer/utility relationship." It contends that an obligation to mutually agree on the type of water meter is implied by Rules 9(a) and (c) of the BCWA Rules and Regulations Governing Rendering of Service that governed the rendering of water services in 1993. This argument finds no support in the plain language of the rules and regulations. *See Singer v. Singer*, 692 A.2d 691, 692 (R.I. 1997) (mem.) ("When contract language is clear and unambiguous, words contained therein will be given their usual and ordinary meaning and the parties will be bound by such meaning."). Rules 9(a) and (c) provide:

> "(a) The [BCWA], after discussion with the Customer or a representative of the Customer, shall specify the type and size of meter to be installed.

> " * * *

> "(c) The Customer shall provide, at the Customer's expense, a readily accessible and protected location for the installation of a meter at such a point as will control the entire supply to the premises. This location must be acceptable to the [BCWA] as most convenient for its service so that the meter may be easily examined, read or removed. The Customer shall also provide suitable pipe connections and the necessary valves and other fittings as may be designated by the [BCWA] for the proper installation and protection of the meter."

Accordingly, even assuming that these rules were the terms of a contractual relationship between the parties, pursuant to the plain language of the rules, mutual

assent was not necessary for the BCWA to install a certain size or type of meter. *See Singer*, 692 A.2d at 692. Therefore, North Farm's argument that a contract to perpetually maintain a master meter system at the North Farm Condominium Complex arose by virtue of the customer/utility relationship is unavailing.

### Count Four

North Farm argues that the hearing justice improperly granted summary judgment on count four because he did not analyze North Farm's allegation that the 2019 pass-through rate is unlawful and unenforceable. North Farm asserts that although count four alleges that the 2019 pass-through rate breached the alleged master meter contract, count four also alleges that the 2019 pass-through rate unlawfully targeted North Farm. North Farm asserts that count four may be read as requesting relief stemming from this allegation because paragraph one of its demand for relief seeks injunctive relief prohibiting the BCWA from shutting off the water supply and contains no limiting language that bases this request solely on the breach-of-contract claim. Thus, North Farm maintains that the 2019 pass-through rate discriminates against it in violation of the requirement that public utilities be "fair and reasonable" under Rhode Island law.

In response, the BCWA argues that summary judgment was proper as to count four because count four is based entirely on breach of contract. Given that there was no contract, it asserts that there could be no breach. The BCWA notes that the

heading under count four specifically seeks "remedies" against the BCWA for "breach of the 1995 contract for a single master meter." The BCWA acknowledges that North Farm alleged that the 2019 pass-through rate was illegal but notes that North Farm has brought forth no evidence to support this allegation. As such, the BCWA maintains that the hearing justice properly granted summary judgment on count four of North Farm's third amended complaint.

Rule 8(a) of the Superior Court Rules of Civil Procedure states, in pertinent part, that "[a] pleading which sets forth a claim for relief * * * shall contain: (1) [a] short and plain statement of the claim showing that the pleader is entitled to relief; and (2) [a] demand for judgment for the relief the pleader seeks." Super. R. Civ. P. 8(a). Under our liberal pleading standard, a "pleading need not include 'the ultimate facts that must be proven in order to succeed on the complaint or to set out the precise legal theory upon which his or her claim is based.'" *Gardner v. Baird*, 871 A.2d 949, 953 (R.I. 2005) (brackets and deletion omitted) (quoting *Haley v. Town of Lincoln*, 611 A.2d 845, 848 (R.I. 1992)). "That is not to say, however, that the drafter of a complaint has no responsibilities with respect to providing some degree of clarity as to what is alleged; due process considerations are implicated * * *." *Hyatt v. Village House Convalescent Home, Inc.*, 880 A.2d 821, 824 (R.I. 2005). Thus, "we require that 'the complaint give the opposing party *fair and adequate notice* of the type of

- 21 -

claim being asserted.'" *Id.* (quoting *Butera v. Boucher*, 798 A.2d 340, 353 (R.I. 2002)).

Count four of the third amended complaint is entitled "Count IV (for remedies against [the] BCWA sextupling the service charge for North Farm to 300 service charges for 300 units at North Farm, which do not have meters and are not customers of [the] BCWA, *in breach of* the 1995 contract for a single master meter[.]" (emphasis added). Count four further alleges that the 2019 pass-through rate "violates the 1995 master meter contract between North Farm and [the] BCWA." To that end, count four seeks injunctive relief prohibiting the BCWA from ceasing water services due to nonpayment of the 2019 pass-through rate, compensatory damages, and a declaratory judgment stating that "the 1995 agreement between North Farm and [the] BCWA for a master water meter is enforceable as a contract * * *." Therefore, count four clearly asserts a claim for relief based upon the Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9, and breach of contract.

Nevertheless, count four also alleges that "[i]n addition to violating the 1995 master meter contract, [the] BCWA's new service charges to North Farm are invalid and unlawful for other reasons as well." The amended complaint proceeds to allege that the "BCWA is evading the cost of purchasing and installing 300 replacement meters, and denying North Farm's unit owners the benefit of precise measurement

- 22 -

of their personal water consumption and costs therefor, which is discriminatory and unlawful[,]" and that "North Farm's unit owners are almost entirely 65 or older, but the senior discount is denied to them under [the] BCWA's new regulation, which is discriminatory."

There is no language in the amended complaint that expounds on North Farm's vague allegation that the 2019 pass-through rate is "discriminatory and unlawful" such that the BCWA was on notice of the type of claim that North Farm was asserting. *See Hyatt*, 880 A.2d at 824. Due process requires that North Farm's complaint give the BCWA "fair and adequate notice of the type of claim being asserted[,]" and North Farm's vague allegation that the 2019 pass-through rate is "invalid," "unlawful," "improper," and "discriminatory" simply misses the mark. *See id.* (quoting *Butera*, 798 A.2d at 353); *Konar v. PFL Life Insurance Company*, 840 A.2d 1115, 1118 (R.I. 2004). Furthermore, a complaint that requires the BCWA to read between the lines of North Farm's breach-of-contract/declaratory judgment claims in order to find North Farm's hidden, "illegality" claim does not give the BCWA fair and adequate notice of such a claim. Accordingly, count four of the amended complaint did not properly plead any basis for granting injunctive or compensatory relief due to unlawful discrimination. Therefore, the only properly pled claim contained within count four was North Farm's claim for declaratory, injunctive, and compensatory relief based upon the BCWA's breach of the purported

- 23 -

master meter contract, and the hearing justice's grant of summary judgment as to count four due to North Farm's failure to prove the existence of a contract was appropriate.

North Farm further argues that summary judgment on count four was improper due to count four's catch-all demand for "such other relief as may be available by law or equity." Therefore, it asserts, under Rule 54(c) of the Superior Court Rules of Civil Procedure, summary judgment should have been based upon the evidence submitted in support of its claim rather than upon any alleged defect in the pleadings. In pertinent part, Rule 54(c) provides that, "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled even if the party has not demanded such relief in the party's pleadings." Super. R. Civ. P. 54(c). As such, the judgment "in an action wherein a party is successful in *establishing a claim* should include the relief to which the party is *entitled*." *Bandoni v. State*, 715 A.2d 580, 598 n.16 (R.I. 1998). However, Rule 54(c) does not permit a plaintiff to "obtain relief not demanded where, although he may be entitled to it, the propriety of such relief has not been litigated." Robert B. Kent et al., *Rhode Island Civil Procedure* § 54:4 (February 2024 Update).

North Farm was not "successful in establishing" its so-called discrimination claim before the hearing justice. *See Bandoni*, 715 A.2d at 598 n.16 (emphasis

- 24 -

omitted).  In the Superior Court, North Farm relied on *In re Woonsocket Water Department*, 538 A.2d 1011 (R.I. 1988), and *Bristol County Water Company v. Harsch*, 120 R.I. 223, 386 A.2d 1103 (1978), to support its proposition that it was entitled to injunctive relief or compensatory damages due to the BCWA's purported unlawful discrimination.  These cases were judicial reviews of decisions by the Public Utilities Commission pursuant to G.L. 1956 § 39-5-1, wherein we noted that although the Public Utilities Commission is not bound by a particular formula in setting rates for utilities, the rate must be "fair and reasonable." *In re Woonsocket Water Department*, 538 A.2d at 1013-14; *Harsch*, 120 R.I. at 232, 386 A.2d at 1108.  Neither holding supports North Farm's proposition that customers may recover monetary or injunctive relief in a private civil action if a public utility's rates are unreasonable. *See In re Woonsocket Water Department*, 538 A.2d at 1014-15; *Harsch*, 120 R.I. at 232, 386 A.2d at 1108.  Further, although on appeal North Farm asserts that the 2019 pass-through rate violates G.L. 1956 § 39-2-1(a)'s requirement that public utilities extract "reasonable and just" charges for furnishing water services, it made no such argument to the hearing justice, and thus this argument is waived. *Nissensohn*, 306 A.3d at 1035 n.7.  Having failed to submit any binding legal authority to the hearing justice to demonstrate that it was entitled to monetary or injunctive relief due to the BCWA's purported unlawful discrimination, North Farm did not establish that it was entitled to such relief, and Rule 54(c) cannot save

- 25 -

its unpleaded claim. *See Bandoni*, 715 A.2d at 598 n.16; Super. R. Civ. P. 54(c); Kent et al., *supra*, § 54:4.

**Denial of the Motion to Amend**

Lastly, North Farm argues that the hearing justice erred by denying North Farm's motion to amend because it violated the liberal standard for allowing amendments to pleadings under Rule 15. North Farm's argument regarding the denial of its motion to amend is not properly before this Court on appeal. Article I, Rule 3(c) of the Supreme Court Rules of Appellate Procedure requires the notice of appeal to "specify the party or parties taking the appeal and shall designate the judgment, order, or decree or part thereof appealed from." Thus, "[w]e will not consider 'an issue on appeal for which a notice of appeal never was filed.'" *Sentas v. Sentas*, 911 A.2d 266, 269 n.3 (R.I. 2006) (quoting *State v. Hallenbeck*, 878 A.2d 992, 1020 (R.I. 2005)). North Farm filed a notice of appeal from the April 6, 2022 final judgment in favor of the BCWA on counts three and four of North Farm's amended complaint. North Farm did not file a notice of appeal from the hearing justice's March 9, 2021 order denying North Farm's motion to amend the complaint to add a proposed count five. While "a notice of appeal that designates the final judgment encompasses * * * all earlier interlocutory orders that merge into the judgment[,]" here final judgment was entered only as to counts three and four, rather than North Farm's third amended complaint as a whole. *Greensleeves, Inc. v. Smiley*,

- 26 -

942 A.2d 284, 290 (R.I. 2007) (quoting *John's Insulation, Inc. v. L. Addison and Associates, Inc.*, 156 F.3d 101, 105 (1st Cir. 1998)). Therefore, we cannot properly consider North Farm's arguments regarding the hearing justice's denial of the motion to amend. *See id.*; *Sentas*, 911 A.2d at 269 n.3.

While we have resolved counts three and four, we are mindful that the litigation between the parties remains ongoing and that several claims and counterclaims remain pending in the Superior Court. We urge the parties to continue to pursue settlement, with perhaps the appointment of a special master, in order to resolve the remaining claims. *See Skaling v. Aetna Insurance Company*, 799 A.2d 997, 1012 (R.I. 2002) ("It is the policy of this state to encourage the settlement of controversies in lieu of litigation.").

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The papers shall be returned to the Superior Court.

STATE OF RHODE ISLAND

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



# OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | North Farm Home Owners Association, Inc. v. Bristol County Water Authority. |
| **Case Number** | No. 2022-167-Appeal.<br>(PC 17-4623) |
| **Date Opinion Filed** | June 14, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>John Deacon, Esq.<br>For Defendant:<br><br>Joseph A. Keough, Jr., Esq. |